## VARICK *vs.* SMITH & THE ATTORNEY GENERAL.

Where a dam is erected upon an ancient stream, to obtain a head of water for the use of one of the state canals, the surplus waters of the stream not wanted for public use, and which continue to flow over the dam [and down the ancient channel, cannot legally be diverted, by a lessee of the surplus waters of the canal, to the injury of the owners of mill privileges on the stream below the dam.

But no person, except by the authority of the legislature, or of the authorized agents of the state, has a right to tap the state dam, and draw off the surplus water of the artificial pond, which is created by such dam for public purposes.

The right of eminent domain does not authorize the government to take the property of one citizen and transfer it to another, even for a full compensation, if the public interest will not be promoted by such transfer. But the legislature is the sole judge as to the expediency of making police regulations, interfering with the natural rights of the citizens of the state; and as to the expediency of exercising the right of eminent domain, for any public purposes.

A bill which sets up only one sufficient ground for equitable relief, is not rendered multifarious by the insertion therein of a separate and distinct claim, upon which the complainant is not entitled to ask for either discovery or relief.

The complainant may join in the same bill two good causes of complaint arising out of the same transaction, where all the defendants are interested in the same claim of right, and where the relief asked for as to each is of the same nature.

Where the rights of the state are involved in the decision, upon a legitimate claim to relief against a person who has an interest in common with the state, the attorney general may be joined as a party defendant in a bill against such person.

THIS case came before the chancellor, on an appeal from a decretal order of a vice chancellor, overruling a demurrer to the complainant's bill. The facts of the case as stated in the bill are fully stated in the following opinion of the vice chancellor, delivered at the time of making the decretal order, which was appealed from.

March 17.

WILLIAMS, V. C.   The bill states that the complainant is, seized and possessed of the following lots of land, particularly described in the bill, together with the appurtenances and privileges thereto belonging: the first lot lying in the village of Oswego, and containing about two acres and a half, described as beginning at the south-east corner of lot No. 1, of the state reservation, upon the bank of the Oswego river, and running thence until it comes again to the westerly bank of the river, and thence along said river to the place of beginning.   The second lot begins at the bank of the river at low water mark, and the line then runs round until it comes again to the west bank of the river, at low water mark, and so along the same to the place of beginning; together with all the right, title and interest of Burt and Clark, and each of them, to the saw mill adjoining said land, and the water privileges appertaining thereto; setting forth the title from the people by letters patent to one *John Allen*, and from him through several others, down to the complainant.   The bill then states that Daniel Burt, while owner of the land, about the year 1801, or 1802, erected a saw mill and wing dam in the Oswego river, on the above premises, which having been carried off by a flood, were rebuilt in the year 1816, and the mill put in operation; and that the said premises so owned and possessed by the complainant are chiefly valuable on account of the hydraulic privileges connected therewith, &c. The bill then states the erection of the state dam across the Oswego river in 1825 and 1826, for the purpose of improving the navigation of the same, and of diverting a part of the water of said river into the canal on the east side of it; and that the waters thus used and diverted are used only on the east side of said river, and that the waters flowing over the dam on the west side of the river are not used or wanted for the purposes of navigation; and that the west wing of the dam is erected on the land of which the complainant is seized, as aforesaid, which extends above and below the said dam, and that the dam entirely destroys his water privileges formerly enjoyed on the premises in question, unless he is permitted to use the waters flowing over the west half of the dam, not wanted for the purposes of navigation.

1835.

Varick
v.
Smith.

The bill further sets forth a title in the complainant, to blocks 78, 90, 99 and 103, in West Oswego, purchased at auction, of the surveyor general, in July, 1827, for which a certificate of the purchase was given by him on the payment of $1,015 down, being part of the purchase money; and by virtue of this certificate of purchase, the complainant claims a right to the water of the Oswego river to the centre thereof, for mills and other hydraulic works; stating, that on the map referred to by the surveyor general in the certificate of sale, the said blocks are designated as mill or water lots, and that the same were represented by him so to be, at the time of the sale, and that the purchaser would have the right to erect wing dams to the centre of the river, for the use of mills to be erected on the premises. The bill also states the payment of $1000, on account of the purchase money due for said blocks, into the state treasury, in July, 1831, the residue not being then due to the state, according to the terms of the purchase; and that the purchasers took possession of the premises, and proceeded to erect wing dams and flumes on the premises first described, and on the blocks aforesaid; and that the canal commissioners, in August, 1827, unjustly and wrongfully assumed to lease, and did lease, to certain persons, (who afterwards assigned to the defendant G. Smith,) as belonging to the state, all the surplus water, which, without injury to the navigation of the canal, might be spared from the west wing of the dam, including one half of the surplus waters in said dam. The bill then declares that the water flowing west of the centre of the river, opposite to the premises of the complainant above described, is not used, wanted or appropriated in any manner for the purposes of navigation, and cannot be so used on account of the rapidity of the current, &c.; and that the Oswego river above and below the dam, and opposite and on the land of the complainant, and west of the centre of the stream, has never been entered upon, possessed and appropriated by the canal commissioners for the Oswego canal, except for the purpose of erecting the state dam; and that Gerrit Smith does not own or possess any land on which he can use the waters assumed to be leased as aforesaid, and that the owners of the saw mill above mentioned have been prohibited

1835.

Varick
v.
Smith.

from drawing the waters from said dam for the use of said mill. And after stating that G. Smith is the owner of mills, water lots and hydraulic privileges on the east side of Oswego river, nearly opposite the premises owned by the complainant, the bill declares, that the said Smith, for the purpose of injuring and oppressing the complainant, and to bring his title to the water privileges on his premises aforesaid into disrepute, doubt and discredit, and for the purpose of deterring persons from purchasing the same, and for the prevention of the erection of mills, &c. on the same, has wrongfully given out, and insisted, and now claims and insists that the lease aforesaid, assigned to him, vests in him the right and title to the one half of all the waters of said river, not wanted for the purposes of navigation, flowing west of the centre of the river, &c., and that the complainant has no right, title or interest in said waters; and that the complainant's wing dam and flume, erected as aforesaid, are trespasses upon the rights vested in him the said Smith, who denies to the complainant the right to use the water flowing over said state dam, and has served a written notice upon the complanant, that he shall require of him to account for the use of said waters, insisting in said notice that the same are his property. And for the like purpose of injuring and oppressing the complainant, the bill complains that Smith has addressed a memorial to the canal board, to cause the wing dam and flume of the complainant to be removed, &c.

The bill then claims that the state had no right to the bed of the river, and that the canal commissioners had no right to lease the waters as aforesaid, and being destitute of authority, they could not by warrant of law lease the said waters as they have done, and that the said lease is null and void; and that the complainant has the right, &c., by virtue of his purchase and possession as aforesaid. And the complainant prays that the said lease may be vacated and cancelled; or that the respective rights of the parties in the premises may be settled and quieted by the decree of this court; or for such other relief, &c.

To this bill G. Smith demurs: 1. On the ground that the complainant had not made such a case as to entitle him either to discovery or relief; 2. That he has prayed for no relief

1835.

Varick
v.
Smith.

which the court can grant; and 3. For multifariousness of the matters in the bill, &c.

An objection is taken to the parties joined as defendants; and if there is a misjoinder of parties, it may as well be settled in the outset; for this question may be raised, even on the hearing. Why, it is asked, are the people made defendants with Gerrit Smith? It must have been done because they were supposed by the complainant to have an interest in the subject matter of the suit. The rule is, that however numerous the persons may be who are interested, they must all be made parties, plaintiffs or defendants, so that a complete decree may be made, settling the rights of all who are interested in the subject of the suit, in order to prevent future litigation. (*Cooper's Eq. Pl. 33.*)

It may easily be seen that the people of the state have an interest in the subject matter of this suit; or at least that they claim to have such an interest, through the influence of their laws, and their officers acting in their behalf. If the lease which is brought into question is set aside, then it is admitted that the people have an interest; and if the rights and interests of the parties may be settled by the decree to be made in this cause, in pursuance of the prayer of the bill, then the rights and interests of the people may be equally involved. It must be conceded that the court of chancery has power to settle such rights, and the attorney general is properly called into court to defend those rights. But a more serious, and more strongly urged objection is interposed to the progress of this suit, by the learned counsel for the defendants; that is, that the complainant has failed to shew any right to come into this court, and claim redress of the defendants. In the first place, it is contended that he has shewn no legal title to a part of the premises which he claims, and out of which must grow his equitable rights; and secondly, that he has no equity on any ground.

On the first point it must be admitted, that if the complainant has not shewn a title to the land, he can have none in the water, which is only an incident or appurtenant to the land. But a title, either legal or equitable, in the subject matter of the suit, is sufficient to warrant the complainant in coming

1835.

Varick
v.
Smith.

before this court for protection against the violation of his rights. If the complainant had founded his right or interest in lands, upon a parol agreement, without shewing circumstances of part performance ; or upon a case of *nudum pactum*, or upon the construction of a will which clearly shewed that he had no title, or the like, his bill could not be sustained. (*Cooper on Pl.* 166.)  Here the complainant sets forth his legal title to some of the land he claims, which was originally patented to Allen ; and to the residue, the blocks of land in the village of Oswego, he shews at least an equitable title.  He shews a purchase of these blocks, at an auction sale, made by the surveyor general, under the statute of 1818.  Upon which purchase he paid down $1,015, and received a certificate of the purchase, which is all the title ever given on such sales until the money is all paid ; since which time he has paid the instalments as they became due.  He has therefore complied with his contract of purchase, and has moreover entered into the possession of the property, and commenced valuable improvements upon it.  Surely here is presented as strong and complete an equitable title as can be shewn in any case ; and it must be considered by this court as entitling the complainant to protection, until the state shall think proper to call his rights directly in question.  Who else can disturb him rightfully in the enjoyment of this property ?  But even a doubtful or inchoate title is sufficient, in many cases, to support a bill seeking the assistance of this court to preserve property pending the litigation concerning it.  (1 *Atkyns' Rep.* 286. *Cooper on Pl.* 171.)  It would, in many cases, be extremely severe in the court, to withhold its aid in protecting the rights of a party in possession of valuable property ; and the present case is one in which the property and interests implicated are of great value, and in which, to leave the party complaining remediless, because he has not perfected his legal title, would be unwarrantable.  In this court the complainant ought to be deemed as having the equitable title to the land in question as against all the world.

But again, it is said that the title of the complainant, whether legal or equitable, has been forfeited, by the non-compliance of the purchaser with certain conditions of the sale.  And

143

1835.

Varick.
v.
Smith.

again, it may be asked, who is to take advantage of this forfeiture ? This is not a matter in issue in this case. Forfeitures are not to be inferred collaterally ; it must be done by a more solemn proceeding, or in a cause, at least, where the question is brought directly and explicitly before the court.

The great question, after all, is, does the right and title of the complainant to the land as described cover the waters of the Oswego river as claimed in the bill ? To establish a right to the land, without the water privileges, would not be advancing a single step in this controversy, which necessarily involves many important points for investigation. Fortunately for me, these are points, most of which are of easy solution ; and some others, the most momentous, have been so elaborately and learnedly discussed and settled in the high tribunals of this state, that it would appear like pedantry and mock wisdom in me to pretend to enter deeply into the investigation of them. For instance, we may consider it as settled in this state, that grants of lands, bounded on rivers and streams above tide water, extend *usque ad filum aquæ,* and if the stream is in point of fact navigable for boats or other craft, the public have a right of passage, or an easement, and nothing more ; and the owner of the adjoining land, or the land bounded on the bank or margin of the stream, has a right to use the land and the water of the stream in any way not inconsistent with the easement due to the public. This is the spirit of all the cases decided by our courts, from that of *Palmer* v. *Mulligan,* (3 *Caines' Rep.* 319,) down to and including the case of *Tibbits,* in the court of errors, (5 *Wendell,* 423.) The prominent intermediate cases are those of *The People* v. *Platt,* (17 *John. Rep.* 211 ;) *Hooker* v. *Cummings,* (20 *Id.* 90 ;) *Arthur* v. *Case,* (1 *Paige's Rep.* 44, 75 ;) and *Ex parte Jennings,* (6 *Cowen,* 518.) It is, however, always to be understood that the legislature have power to take the property of individuals for necessary or useful public purposes, provided a fair compensation is made to the owner, but not otherwise. In *Gardner* v. *The Trustees of Newburgh,* (2 *John. Ch. Rep.* 162,) this principle is amply discussed by the late Chancellor Kent. He justly calls in the great and sacred principle of private right ; and well may we in this country consider it so, when even despots have

been held at bay by it in foreign countries. It was in the spirit of this principle that the supreme court declared, in the case of *Jennings*, that neither the state nor any individual had a right to divert the stream, or render it less useful or valuable to the owner of the soil.

But it seems necessary, in order to define and settle the rights of the owner of the land bordering on a river, to examine the structure of his grant. No doubt he may be restricted by the words of it, to the use of the land itself. And we see, by the description of the complainant's land, by virtue of which description he claims the use of the water to the centre of the river, there is something particular in the terms used. One of the lots is bounded upon the bank of the river, and along the river. Another lot is bounded on the bank of the river at low water mark. The blocks in the village of Oswego are not described particularly in the certificate of sale ; but it refers to the map of the village, in the office of the secretary of state, and the blocks are sold as laid down on that map. And the bill states and avers, that the map referred to designates the blocks sold as being mill and water lots, and that the surveyor general, at the sale, represented the blocks as such, and that the purchaser would have the right to use them as such, and to erect wing dams to the centre of the river for the use of mills, &c. The facts here stated must be taken as true on this demurrer. Now, what is the proper construction of these and similar words ? Here again, whatever doubt we might have felt, if unrestrained by the weight of authority, we must bow to the decisions of our courts. In *Jennings'* case the land was bounded on the margin of the stream. These words are too clear to admit of misconstruction on any other subject ; they do not import the centre of the stream ; and yet the court say, that the various cases on the subject proceed upon the principle that the owner of the land on the margin owns the bed over which the river passes : " and though it be nominally and in terms bounded on the margin, it extends, by construction of law, to the centre of the stream." And again, the court say : " If the state had intended to retain the property in the stream, they should have inserted an express reservation or exception in their grants." It is accordingly

1835.

Varick
v.
Smith.

decided in that case, that the grant carried the land to the middle of the stream. The attorney general, who was bound to contend against all this doctrine, if it was not law, declared, with some anxiety, that he would not advocate a doctrine which would operate as a fraud on purchasers; and then argued that a reservation of the stream ought to be presumed, because the grants were not produced.

The language of the chancellor on this point, in the court of errors, (5 *Wendell*, 443,) is very clear and strong. Speaking of rivers and streams above tide water, he says, " If the grant is bounded on the stream, or along the same, or on the margin thereof, or when other words of similar import are used, the grant legally extends to the middle or thread of the stream."

Thus we are able, and in duty bound to pronounce, that the complainant has a right to both land and water, according to the claim set up in his bill ; and of which he connot be deprived, except by his own act, or by the operation of law.

I lay out of the case the declarations of the surveyor general, made at the time and place of sale of the blocks; nor does it appear important to say whether the sale was under the act of 1813 or of 1818, although in the latter act there is an express authority to sell, with the blocks, the privilege of diverting as much of the water of the river, by erecting wing dams, as may be necessary for the use of such mills as may be erected on the land ; nor do I deem it material, considering the broad grounds on which the complainant's rights are based, to decide whether the act of 1818 was repealed or not, by subsequent statutes, passed in relation to the canals, as contended for by the learned counsel for the defendants. For although the erection of these great public works created a new order of things, as was contended, yet I take it for granted that no order of things produced by a statute or statutes can take away the constitutional rights of our citizens. The great charter of our rights is yet paramount to any statutes that have been or may be passed, whenever they come in collision, however magnificent the order of things may be which such statutes establish. And unless the statute which infringes the rights of an individual is explicit in its terms, and is clearly within

the sacred bounds of the constitution, I believe no judge can uphold the enactment.  If, therefore, there is no defect in the foundation upon which the complainant's claim is built, thus far, we are next to inquire whether that claim is invalidated by any legislative act, clear and explicit in its terms, and constitutional in its provisions.

The first statute in relation to our internal navigation was extremely cautious in its provisions in regard to private rights. With an eye to the principles of the constitution, no lands, waters or streams were authorized to be taken for public use, without making adequate compensation to the owner ; (see Stat. sess. 40, § 3 ;) and no lands, waters or streams were authorized to be taken, unless they were necessary for the great works which were to be commenced.  The act incorporating the Oswego Canal Company, passed in 1823, was drawn with equal regard to the rights of individuals; which canal was afterwards adopted by the state, and placed on the same footing as the other internal improvements.  Nor can I find that the acts of 1823 and of 1825, on the subject of hydraulic privileges, contain any provisions which can fairly be construed as taking away the rights of individuals, except for public use, and on the terms secured by the principles of our government.  These two statutes are in *pari materia*, and are to be construed together.  The first provides for the owners of mills, or of hydraulic privileges.  The second provides for all other cases, where there is surplus water, authorizing the commissioners to lease it.  But there is nothing in either depriving individuals of their water privileges, unless for public use.

It would be doing injustice to the legislature which passed these statutes, to put a construction upon them that would work unnecessary wrong to private rights.  Water power was not to be created for the purpose of vending or leasing it.  It might, by diversion or daming, be incidentally created ; and in such a case provision has been made for disposing of it by lease.  On any other construction, the legislature might be accused of doing what they certainly never intended to do—of taking the property of one citizen and selling it to another. This is forbidden by the great principles of public policy and justice, acted upon by all governments having the least re-

gard to the rights of the governed. It may be taken for pub-lic purposes, on tendering to the owner a just compensation; but for no other purposes whatever.

A dam may be raised to divert a stream of water, for the purpose of supplying a public canal. If, in this way, more water accumulates in the canal than is useful, as it necessari-ly will at times, it may be fairly considered surplus water, and may be leased. But if more water is diverted than is useful for the canal, and for the purpose of creating water power to lease, to the injury of the owners of water privileges on the stream thus diverted, can any one maintain the act? So, in the case of a dam for the purpose of creating slack wa-ter for public navigation, can the dam be erected higher than is necessary for public use, when the rights of individuals are in-vaded by it? One would suppose it could not be done; and much less could it be done for the purpose of leasing water privileges to other individuals. And perhaps it would not be going too far to hold, that after all public purposes are fully answered, the water which flows over the dam in question to-wards the ocean, in its natural course, may be used freely by those who owned the water privileges there before; especial-ly by those who, in addition, own the land over which it flows. As to this, however, I would speak with diffidence, as the dam is owned by the state, and was constructed for public use, al-though on the land of an individual.

If the canal commissioners have transcended the powers given them by the statutes, their acts are void. So far as the lease in question conveys the water flowing over the dam, it may be valid. If the lessee can devise any way to use that water on the dam, without owning a foot of land under it, he may perhaps be allowed so to use it; but having no right to divert it, and having no property in the water itself, but a sim-ple usufruct as it passes along, and remembering that *aqua currit et debet currere*, he must take care that the owners above and below, and on each side, are not prejudiced unreasonably by his use of it. If such plain and obvious principles (not it is hoped, improperly adverted to and called into action in a coun-try boasting of its equal rights) stand in need of confirmation,

1835.

Varick
v.
Smith.

they will find it in the commentaries of Chancellor Kent, (3 *Kent's Com.* 351.)

If, then, the lease in question was intended to convey more water than the fair surplus; which, upon the foregoing principles, may be derived from a necessary accumulation of water for public use, I must say that it is void for the excess ; and any attempt to control or divert the free course of the water which is not wanted for public use may be prevented. As to any claim to this water after it had passed over the dam, or any right to interfere with its use by the owners below, it was abandoned before the close of the argument : and very properly so ; for if water must run, and ought to run, and if the use of it as it passes is all that can be claimed by any one, what right have those above the dam, or on the dam, to interfere with the claims of those below ? All property must be enjoyed according to its nature ; and water is an element, though useful and powerful, yet almost as free as air ; and no man can be allowed to cripple its use, or invent novel conditions in relation to it, unless by the sanction of a valid act of the legislature.

The objection taken to the complainant's right to make the improvements in Oswego river, below the dam, does not appear to be tenable. If these works are a public nuisance, the question cannot be settled in this collateral way, any more than the question of forfeiture. (3 *Caines' Rep.* 315, 319. 7 *Cowen's Rep.* 266.) But all the statutes declaring streams to be public highways leave the rights of individuals as they were, subject only to the public easement. There is nothing peculiar in the act of 1798, declaring the Oswego river a public way. Nor can it be properly urged that the complainant had no right to purchase the Burt property after the state had erected the dam ; or that, after the state had appropriated all the water privileges on the dam, he obtained no rights by his purchase. This objection is a begging of the very question. What has the state appropriated ? I have endeavored to shew. Whatever it may be, the canal commissioners have leased that, and nothing more ; and the complainant or any other person had a right to purchase the remainder, of the owner who was in possession. If the commissioners have at-

tempted to lease more than was appropriated by law, the lease is void *pro tanto*. The complainant purchased the land, with all the privileges and appurtenances thereto belonging; and thus much his grantor had a right to sell and convey. What these privileges are is the question to be settled. And no one, it is believed, is debarred the right of disposing of the property which the state leases to him, after a part of his property has been taken for public uses.

One other objection to this bill has caused me some trouble in the investigation, and must not be overlooked: that the complainant has no clear and certain rights to be protected, and ought not to come into this court until his rights are established at law. This has been so held in many cases where the right was doubtful, and the injury threatened not imminent or disastrous. But I find the modern practice of this court is, to afford relief on the case stated in the bill, if a clear right is set forth, until the merits can be brought before the court; especially in cases where impending injury may be prevented, and the remedy at law is inadequate. (1 *Paige's Rep.* 416. 2 *John. Ch. Rep.* 463. 3 *Idem*, 282.) In the case before me, I think the rights of the complainant, as stated in the bill, are clear enough to entitle him to relief in this court, without a trial at law; as he has been a considerable time in possession, and is in the act of erecting extensive and valuable improvements. Although, on the merits, after a full investigation, with all the facts before the court, I may still have doubts as to a part of the bill, yet this demurrer, being general to the whole bill, must be overruled. (*Mitford's Pl.* 173. *Le Ray* v. *Veeder*, 1 *John. Cas.* 417. *Leight* v. *Morgan, Idem,* 429. 3 *John. Ch. Rep.* 467. 5 *Idem*, 184.)

Having come to the conclusion that the bill requires an answer, and after shewing that the complainant has equitable rights, we must next examine the question put by one of the counsel for the defendants: What sort of a decree can be rendered in such a case as this? This bill is in the nature of a bill of peace or *quia timet*, and one of the objects of it also is to settle the rights of the parties. The lease under which the defendant Smith claims, ought not perhaps, in this stage of the cause, to be declared entirely void, because, as we have

seen, it may convey some interest in the water while it is actually flowing over the dam. That Smith has no right to prevent the water from flowing over the dam, and from taking its natural course over the bed of the stream, would seem to be perfectly clear. While the water is flowing thus in its natural course, and over the premises of the complainant, it appears to be as clear that he cannot be molested in the use of it for hydraulic purposes; and he may consequently erect the necessary wing dams and flumes to enable him to enjoy his rights. And if the state has not the right, and moreover, has never asserted a right, to divert this stream of water for any other than public purposes, where it would interfere with the private rights of our citizens, as I have attempted to shew, then of course the officers of the state, its lessees and assigns, may be restrained from asserting and attempting to exercise such a right.

In settling the rights of the parties, there is perhaps no difficulty, thus far, in complying with the prayer of the bill; although I have not thought that the court will be warranted in declaring the lease null and void, in the present stage of this cause. Under the general prayer of the bill, other relief may be awarded to the complainant which is consistent with the equity of the case, as stated in the bill. In cases, not exactly like the present, injunctions have been granted by the courts of chancery in England and in this state, to restrain the defendant from doing any act to the injury of the party complaining. *Arthur* v. *Case*, (1 *Paige's Rep.* 447,) presents a case not unlike the present; and the chancellor had no doubt of his jurisdiction, in restraining the erection of a dam which would, in a great measure, have destroyed the complainant's valuable mills. The regulation, he says, of the use of water upon the different sides of a stream for hydraulic purposes is so essential, &c. that it would be deplorable if any of these important establishments could be destroyed by any individual, or combination of persons, and the owners left to seek an uncertain remedy by an action for damages in a court of law. Chancellor Kent had before put forth the like power, in restraining the trustees of Newburgh, who professed to act under the authority of a statute, from diverting a stream used

merely for watering cattle, and other domestic purposes. (2 *John. Ch. Rep.* 162.) Again, he interfered to restrain persons acting under a statute, from cutting a ditch to drain a swamp, because it would injure the plaintiff's mills. And this was in a case where the injury was only threatened ; the ditch had not been commenced. (2 *John. Ch. Rep.* 463.) And the chancellor refers to a number of cases in England, where injunctions were laid upon trustees and canal commissioners, who were restrained from illegally invading the rights of others. These cases, he thought, removed all doubt on the point of jurisdiction ; and he granted a perpetual injunction to prevent the defendants from entering upon the projected work. This remedy is also in accordance with the *brevia anticipantia*, or writs of prevention, which, according to Lord Coke, anciently existed, and were maintained *quia timet*, before any molestation or distress. A decree must therefore be entered overruling the demurrer.

*J. C. Spencer & D. Cady*, for the appellant. The bill is multifarious, and the demurrer should have been allowed for that cause. The complainant first seeks to have the lease set forth in his bill declared void. If the lease be not declared void, then he prays that the rights of Gerrit Smith, under the lease, may be declared and settled by the decree of this court. By his bill he also seeks to have his title established in the bed of the west half of the Oswego river, both above and below the dam, and opposite to the three distinct parcels of land described in the bill ; the titles to which parcels are separate and distinct. He further seeks to have his right established to keep up a wing dam and flume, which he has built below the state dam, in the bed of the Oswego river ; and thereby to flow the water back upon the state dam, to any height that will not endanger the dam. And lastly, he seeks to have his right established to keep up the saw mill built by J. Burt, subsequent to the erection of the state dam, which is placed immediately below it, and to propel the same by water drawn directly from the state dam, or as it falls from that dam. And unless it can be shown that all these matters depend upon one general right, and are in some way connected with each oth-

er, the bill is multifarious. (*Devouc* v. *Fanning*, 4 *John. Ch. Rep.* 199. *Cooper's Eq.* 30. 1 *Vern. Rep.* 463. *Hard. Rep.* 337. *Mitf. Pl.* 147. 5 *Mad. Rep.* 146. 2 *Sim. & Stu. Rep.* 329.)

The complainant has not presented such a case in his bill as exhibits any equity to entitle him to call upon this court to have the lease declared void, or to have its construction settled as between him and Gerrit Smith, or to establish any of the rights claimed in his bill. It does not allege that G. Smith is attempting to divert the water from the complainant. (4 *John. Ch. Rep.* 165.) The question whether the lease be valid or not, and if valid what is its true construction, are questions of law depending on the interpretation to be given to various acts of the legislature, passed in relation to the surplus waters of the canal.

The complainant and his grantors, as riparian owners, had no right to use the waters of the Oswego river. The river was a public highway, and could not be obstructed by dams. Whatever rights they had were extinguished by the erection of the state dam; and they were entitled to compensation for the loss of those rights. As riparian owners, they acquired no right to the surplus water artificially created by the erection of the dam. All that they could claim was the water flowing in the river.

By the purchase of the blocks, no right to the water of the river was acquired. The certificate of the surveyor general does not purport to convey any such right. His declarations at the time of the sale, or at any other time, could not confer such a right. It was not a sale under the act of 1818, but under that of 1813. The certificate refers to the general act authorizing the commissioners of the land office to sell the public lands. (1 *R. L. of* 1813, *p.* 295.) Section 12 of that act conferred the authority, and section 32 particularly specifies the lots at Oswego. The conditions of the act of 1818, and the terms on which the privileges only were to be obtained, do not appear to have been complied with. The act of 1818 was virtually repealed, so far as these water rights were concerned, before the sale. In 1823, (*Laws of* 1823, *p.* 322,) the Oswego Canal Company was incorporated. In 1824, (*Laws*

of 1824, p. 342,) the canal was adopted, and all the power of the canal commissioners to take waters, &c. was extended to this canal; and, by subsequent acts, it has been recognized as one of the public canals of the state. (1 R. S. 218.) The act of 1818 certainly gave no authority to the surveyor general to sell water rights which were subsequently created by the erection of the state dam. All authority on this subject was vested in the canal commissioners. (Laws of 1825, p. 399, § 3.)

Whatever right existed in consequence of the purchase of the block, was extinguished by the erection of the state dam, and by the appropriation thereby of the water of the river to the purposes of the Oswego canal. (1 R. S. 226, § 49.) The waters were not divisible. The whole and every part were equally appropriated by the commissioners; and if the complainant was injured thereby, he was entitled to compensation. The act of 1823, (sess. 46, ch. 112,) gave the complainant no right to the surplus water which this court can enforce. The bill does not show which of the grantors of the complainant owned or legally used any mill or water privilege that was benefitted or prejudiced by the dam. It does not show under which of his grantors the complainant claims the preference of the water privilege. Both of his grantors could not possess it; one of them owned the saw-mill, and another owned the land adjoining the same. The preference given by that act is a substitute for the claim for damages; which could not be legally transferred, and which in fact never was transferred to the complainant. (10 Wend. Rep. 178.) The complainant's grantors were not entitled to the benefits of that act. They had not theretofore legally used or enjoyed any mill or water privileges, as the river was a public highway; and the bill does not show that any mills or water privileges were used or enjoyed in 1823. No compliance with the terms of the act has been shown to entitle the complainant's grantor to those privileges. The act of 1823 was virtually repealed by that of 1825, authorizing the canal commissioners to sell the surplus waters.

If the complainant has any such rights as he claims, his remedy is by an application to the supreme court, for a man-

damus to the canal commissioners. His rights, if any, are not so vested, legally or equitably, as to entitle him to come to this court to enforce them againt G. Smith.

The lease to G. Smith vests him with a valid title to one half of the surplus water created or kept up by the dam; and entitles him to the fall of the water, and to the power created by its descent from the dam to the bed of the river.

*J. A. Spencer & C. A. Mann,* for the respondent, A. Varick. The bill is not multifarious. Although the lands of the complainant are separately described, they are all contiguous and connected, and constitute in fact but one parcel; the title to which is derived immediately from different grantors, but originally from one source. The bill seeks only to settle such claims as the defendant G. Smith asserts under and by virtue of his lease. All the specific relief prayed for will necessarily result from establishing the right of the complainant, as riparian owner, to use the waters of the river to its centre, as they flow, subject to the easement of the public; and in such manner as not to interfere with the navigation of the canal, or the works connected therewith. The bill does not unite different subjects or claims, requiring distinct examinations, and is not multifarious; because different kinds of specific relief are prayed for, the complainant is entitled to any relief consistent with the case made in the bill. (*Colton* v. *Ross,* 2 *Paige's Rep.* 396.)

The complainant, as the riparian owner, is seised of the bed of the Oswego river, and of a right to the use of the water, to the centre, opposite his land as described in the bill. (*Ex parte Jennings,* 6 *Cowen's Rep.* 543. *The Canal Commissioners* v. *The People,* 5 *Wendell's Rep.* 423. 3 *Kent's Com.* 346.) He is not deprived of this right, by the Oswego river being declared a public highway. He is still seised of the bed of the river, and has a right to use the water in any way not inconsistent with the public easement. This appears clearly by the second section of the act of 1798, (3 *R. S.* 248,) which imposes a penalty only for obstructing the navigation, and gives the right to riparian owners to dam up the waters of the river, by constructing a canal in such manner as to leave

the navigation unobstructed. The navigation of the river being obstructed by the state dam, in pursuance of power given by statute, the act of 1798 is virtually repealed, so far as it was applicable to that part of the river. The land, of which the complainant is seised, and the bed of the river opposite thereto, to the centre of the stream, having been granted by letters patent, in 1790, to John Allen, from whom the complainant derives title, the act of 1798 could not divest him of his title to the bed of the river. The right in the complainant to use the water of the river, opposite the block purchased at the surveyor general's sale, belongs to the complainant as riparian owner; and it is immaterial whether the sale was under the act of 1813, (1 *R. L.* 295, § 12,) or under the act of 1818. (*Sess. Laws of* 1818, *p.* 131.) The act of 1818 shews the intention of the legislature to give to the owner of these blocks a right to erect a dam, although it might interfere with the public easement. The blocks purchased at the surveyor general's sale were described and sold as *mill* or *water* lots; and a right to use the water and dam up the river would necessarily pass as an appurtenant to such lots.

The canal commissioners, in the prosecution of the improvement of the Oswego river, were authorized to take for the use of the public only such lands and water as were necessary for the purposes of navigation; and the surplus remains to the original owner, to be used in any manner not inconsistent with the public right of navigation. The right of *eminent domain* does not justify the taking of private property for any other purpose than strictly for public use; and when that use is satisfied, the power to take is spent. The lease in this case is of " all the surplus water which, without injury to the navigation or security of the canal, may be spared from the Oswego canal; to be taken and drawn from the west wing of the first dam above Oswego, including one half of the surplus waters in said dam." The lease, in its terms, shews that the water in the river called in the lease the Oswego canal, which was intended to be conveyed, was not wanted for public use. The commissioners, therefore, could not take it, as it was private property not wanted for public use; and the lease is for this reason void on its face. The

waters of the river are in effect made divisible by the commissioners, and by the lease itself. That portion of it which is wanted for navigation, or public use, constituting one portion, and the surplus or residue another portion; and the residue is not and cannot be appropriated for public use. The use of water is as much a subject of property as land. And where a portion of the waters of a stream is taken for public use, the residue remains the property of the original owner; of which he cannot be deprived, even by making just compensation.

The west half of the Oswego river not constituting any part of the Oswego canal, the commissioners possessed no power, under the statute, to lease the water mentioned in the bill; and the lease for this reason is void. The statute, (*Sess. Laws of* 1825, *p.* 399, § 3, 1 *R. S.* 230, § 75,) must have intended to confer on the commissioners the power of leasing only such hydraulic privileges as had been created by the erection of the canal. It is only such privileges that are the property of the state; and such only are surplus waters. The act could not confer the power of leasing any waters which the commissioners had not power to take for the purposes of navigation. The surplus waters leased in this case are not such surplus waters as the statute intended should be leased. It is averred in the bill, that G. Smith is not possessed of any lands, on which he can use the water leased. And the commissioners in such case had not power to lease, without the consent of the owner of the land. (1 *R. S.* 233, § 89.) No such consent is shewn, and is not to be presumed, as it is not recited in the lease; nor is it pretended that any ever was given. The lease is dated the 30th of June, 1828; and although it purports to have been given under the act of the 20th of April, 1825, yet the commissioners were, at the date of the lease, only authorized to lease in pursuance of the act of 1828; and no forfeiture or non-compliance with that act is shewn or recited in the lease. And until that is shewn, the commissioners possessed no power to lease. The provisions of the act of 1828, (1 *R. S.* 231, § 80, 84, 88,) authorizing the commissioners to lease hydraulic privileges, before used and enjoyed, if the owner neglected to

construct a flume, &c., and to pay the enhanced value of the water power into the treasury, are unconstitutional and void. The effect of those provisions was to deprive an individual of his property, without taking it for public use, or making any compensation therefor.

Whenever the people of the state construct a dam across a river, to divert a portion of the stream for the purposes of the public use, they do not thereby acquire title to the whole water of the stream. And if, in erecting such dam, they improve the hydraulic power of an individual, that individual is entitled to use the same, in its improved state; in any manner which is not inconsistent with the public right of navigation. Such is the rule in relation to land; where a part is taken for the public use, the residue remains to the owner, to be enjoyed and used in its improved state; and that, without making any compensation to the state for the benefit so conferred. The state took for public use one-hundredth part of the water of the Oswego river, which was private property. In taking this, the position of the whole water was changed. This change neither divested the owner of his title to the residue, nor gave the state any right in or to it. The original owner is bound not to use it in a manner which is incompatible with the public use; but he is obliged thus to use it in its changed position, and is not thereby wholly divested of his right.

This court has jurisdiction to grant relief to the complainant, upon the case made in the bill. (*Belknap* v. *Tremble*, 3 *Paige's Rep.* 577. *Arthur* v. *Case*, 1 *Id.* 447. *Hamilton* v. *Cummings*, 1 *John. Ch. Rep.* 517. *Gardner* v. *The Trustees of Newburgh*, *Id.* 162. *Brownley* v. *Holland*, *Cooper's Rep.* 29.) This court has power to order a deed forming a cloud upon a title to be delivered up. (17 *Ves. Rep.* 111.) The complainant has no mode of trying his right at law, and no remedy by applying to the supreme court for a mandamus.

THE CHANCELLOR. This is an appeal from a decretal order of the late vice chancellor of the fifth circuit, overruling the demurrer of the defendant Smith to the complainant's bill. The main questions presented by the bill are as to the

rights of the complainant as the riparian owner of lands on the west side of the Oswego river; and as to the right of the the lessee of the state to divert waters, not wanted for the purposes of the public, to the injury of the complainant as the owner of water privileges on the Oswego river below the state dam. Upon these questions, it seems to be useless for me to add to the very able and lucid opinion of the vice chancellor. It is unnecessary, and it would be improper to attempt, in this stage of the suit, to declare precisely what relief the complainant may be entitled to upon the final hearing of the cause; as the case made by the bill may be materially affected by the answer and the proofs. As the case now stands, the complainant is clearly entitled to restrain the defendant Smith from diverting the water which naturally flows over the state dam, and which is not wanted for any public purpose, from its natural course down the original bed of the river; whereby the mills and mill privileges of the complainant, situated below the dam and upon his own premises, may be injured. The eightieth section of the title of the revised statutes relative to the canals, (1 *R. S.* 231,) does not appear to apply to such a case. The object of that provision of the statute was to give to the owner of mills, adjacent to a state dam, the benefit of a head of water created at the expense of the state, so far as the water was not wanted for state purposes; upon the payment, by such mill owner, of a reasonable equivalent therefor. Such a head of water being created for the legitimate purposes of public improvement, no one has a right to tap the state dam, so as to draw off any portion of the artificial pond, without the consent of the legislature or its legally authorized agents. So far as the raising of the artificial pond, for the use of the public, has the effect, either wholly or in part, to divert the natural flow of the water, from the original bed of the stream below the dam, the law has made provision for compensating those who are injured thereby. But whatever remains of the stream, beyond what is wanted for the public improvement, and which continues to flow over the dam and down the original channel of the river, unquestionably belongs to the owners of water rights upon the margin of the stream below; in the

1835.

Varick
v.
Smith.

same manner as if the state dam had not been erected. I had occasion in another case to say, that the right of *eminent domain* did not imply a right, in the sovereign power of the state, to take the property of one citizen and transfer it to another, where the public interest would be in no way promoted by such a transfer ; even if a full compensation for such property was awarded to the owner thereof. In this opinion I am fully sustained by the decision of the supreme court, in the recent case as to the extension of *Albany Street* in the city of New-York. (11 *Wend. Rep.* 149.) The principles upon which forced sales of private property were compelled by the civil law, for the public good, were certainly as extended as any government can ever claim, consistently with the private rights of its citizens. And it is not pretended that, even under the arbitrary government of the Roman emperors, it was lawful or justifiable for the sovereign to take the property of one citizen and give it to another, where the public interest was not concerned in such transfer. (1 *Domat's Civil Law, B.* 1, *tit.* 2, § 13.) A recent English writer, who admits the general right of the sovereign power to control or dispose of private property, paying a just compensation therefor, and to regulate and control the enjoyment of things before existing in common, considers a causeless or corrupt limitation of pre-existing rights as an abuse of the power. (*Thomas' Univ. Jurisp.* 171.) Perhaps in England, where the power of parliament is said to be omnipotent, so far as the exercise of mere human power is concerned, there may be no remedy for such an abuse of power, where it is by a concurrent act of the three estates of the realm. But in a state which is governed by a written constitution, like ours, if the legislature should so far forget its duty, and the natural rights of an individual, as to take his private property and transfer it to another, where there was no foundation for a pretence that the public was to be benefitted thereby, I should not hesitate to declare that such an abuse of the right of *eminent domain* was an infringement of the spirit of the constitution ; and, therefore, not within the general powers delegated by the people to the legislature. But while I deny to the legislative power the right thus to take private property for the mere pur-

pose of transferring it to another, I admit that the two branch-
es of the legislature, subject only to the qualified veto of the
executive, are the sole judges as to the expediency of making
police regulations interfering with the natural rights of our
citizens, which regulations are not prohibited by the constitu-
tion ; and also as to the expediency of exercising the right
of *eminent domain* for the purpose of making public improve-
ments, either for the benefit of the inhabitants of the state
generally, or of any particular section thereof. In the present
case, I am not prepared to say that any provision of the re-
vised statutes, when properly construed, can be considered as
an unconstitutional infringement of private rights; or that
the claims set up by the defendant under this lease can be
sustained, to their full extent, in conformity with the declared
intention of the legislature, as contained in those statutes.

I think the objection for multifariousness is not well taken.
A bill is not multifarious where it sets up one sufficient ground
for equitable relief, and sets up another claim which, upon its
face, contains no equity which can entitle the complainant to
the interposition of the court, either for discovery or relief. The
proper course for the defendants in such a case is to answer as
to the first, and demur to the last for want of equity. Or he
may answer as to both ; and make the objection, as to the
want of equity in the last claim, at the hearing. Neither is
a bill multifarious because two good causes of complaint, aris-
ing out of the same transaction, are joined in one suit, in
which all the defendants are interested in the same claim of
right ; and where the relief asked for in relation to each is of
the same general character. The attorney general appears
to be a proper party to the suit, so far as the rights of the state
are connected with any legitimate claims to relief against the
defendant Smith. But even if he is an unnecessary party, it
does not authorize Smith to demur to the bill on that account ;
unless there is some valid claim in equity against the attor-
ney general as the representative of the state, in which the
defendant Smith is in no way interested. Such a claim, if it
could be sustained in this court, might render this bill mul-
tifarious. I am not aware, however, of any authority to sue
the attorney general in this court, as the representative of the

rights of the state; except where those rights are connected with the relief sought against some other defendant. (*See Mitf. Pl., Edw. ed. 31, 101.*)

As I am satisfied the complainant is entitled to some part of the relief claimed, upon the case made by his bill, and that the objection as to form taken by the demurrer cannot be sustained, the decretal order appealed from must be affirmed, with costs.