Wood, J.
In this case, the pleadings, exhibits, and depositions are within no ordinary compass. Yolumes have been ably written by counsel, and we have derived great aid from their assistance, in extracting from the mass of papers the real merits of this controversy, by no means unimportant or inconsiderable.
*296 The first inquiry which arises is, what wore the rights conferred upon the complainants, by the lease from the acting commissioner, executed in May, 1832? This instrument is an exhibit in the case, and its terms can not easily bo misunderstood. After disposing of the surplus water to the complainants, at a yearly rent of $120, it recites, “ That the party of the second part is to have the use and occupancy of the surplus water which may flow in the north fork feeder, over and above what may be required to supply the canal with water for navigation ; the party of the second part having the right, so far as the rights and interests of the state are concerned, 296] to cause so much of the water of said fork to flow *in said feeder, as can flow therein with safety; and to use all of said water for hydraulic pui'poses, excepting so much as is wanted by the state for navigation.”
If the acting commissioner, at any period anterior to the execution.of this lease, entertained the opinion, that as the agent of the state, he had an unlimited control over the waters of private streams, not only sufficient to insure the safe and steady navigation of the canal, but to their exclusive appropriation, as, in his discretion, the interests of the state would be best promoted and secured, it is cei’tain, when the lease was given, he claimed no such authority. By the terms of the lease, the complainants purchased only the use of the surplus water, after the canal was supplied, and the right to flow through the feeder any quantity that could safely flow therein, so far as the interests of the state were concerned. The acting commissioner, whoso deposition is before us, also swears that he informed the complainants distinctly, that he could only convey the surplus water, as the state claimed no further rights to the use of the stream than to take sufficient from it to supply the canal, and that he then advised the complainants to purchase in the rights of intermediate riparian proprietors, in order to guard against contingencies, and to insure, on future occasions, water sufficient for the propelling of their said mills. How, then, were the plantiffs deceived, or what reason had they to suppose they purchased anything more than the surplus water and the use of the feeder ? There is surely nothing in the case to lead to such conclusion. But suppose the acting commissioner had assumed to sell all that the complainants charge in their bill that they believe was conveyed, would it lay the foundation for relief against these re *297 spondents? It is clear, nothing would have passed by such sale, but what the complainants have acquired. The state, notwithstanding the sovereignty of -her character, can take only sufficient water, from private streams, for the purposes of the canal. So far the law authorizes the commissioners to invade private right, as to take what may be necessary for canal navigation, and to this extent, authority is conferred by the constitution, provided a ^compensation be paid in money to the owner. [297
The principle is founded on the superior claims of a whole community over an individual citizen; but then in those cases only where private property is wanted for public use, or demanded by the public welfare. Wo know of no instances in which it has, or can be taken, even by state authority, for the mere purpose of raising a revenue by resale, or otherwise; and the exercise of such a power would be utterly destructive of individual right, and break down all the distinctions between meum et tuum, and annihilate them lorever, at the pleasure of the state. 5 Ohio, 392. The uses of the waters of private streams belong to the owners of the ' lands over which they flow. 4 Ohio, 253 ; Kent Com. 344. They are as much individual property as the stones scattered over the soil. If such streams can bo passed with boats and rafts, the public has the right of passage; but, subject to such easement, the owner of the land may appropriate the use of the water in his own discretion, taking care not to flow it on the proprietor above, and to return it to its natural channel before it leaves his own lands. 8 Eng. Com. Law, 371. It follows, if such waters should be taken by the state for the mere purpose of creating hydraulic power, and rented to an individual, the transaction would be illegal, and no title would pass, as against the owner. Id. In conducting water through the feeder, a discretionary power must necessarily rest in the agents of the state, and in making provision for a supply, it must frequently occur that a surplus will accumulate, and it was the right to the use of this surplus water, which the lease conveyed. There is surely no evidence that when the lease was executed, the acting commissioner made any false or fraudulent representations, nor that the lease itself does not contain the real contract between the parties ; and thus far we can not perceive any ground of relief upon any of the reasons assumed.
But it is claimed that Schmucker and the Willsons acquiesced *298, 299 in the erections made by the complainants, and the use they made of the water; saw them make their improvements, and expressed 298] their approbation, and that they and their grantees *are, therefore, estopped from setting up any conflicting rights. The respondents, doubtless, stand in the situation Schmucker and the Willsons would occupy were they still in possession. The Will-sons, when they purchased of Schmucker, and the respondents when they bought of the Willsons, know that the complainants •were in the possession of this water power, and it is a well-settled principle, which b'as been repeatedly recognized by courts of equity, that the purchaser of what is in another’s possession, and with knowledge of such possession, is bound by all the equities which existed. between the vendor and the occupier. Indeed, it has been often said, that notorious possession of real property must be considered as constructive notice to the purchaser, and that he takes it subject to the equities of the possessor. If the conduct of Schmucker and the Willsons was such as to raise the presumption of a license to the complainants, such license would not only bind Schmucker and the Willsons, but all claiming under them. It would run with the land, and be deemed irrevocable. I must say, however, that there is nothing in the evidence in this case to raise the presumption of any such license. But if Schmucker and the Willsons stood by and saw the complainants expend their money in improvements, when in justice and equity they ought to have disclosed to them conflicting rights, and put them on thoir guard, the complainants acquired an easement in the use of the water of which fheycan not be divested by the respondents. The rule is, if one is silent when he should spe'ak, that justice will compel him to silence when he would speak. “ There is no principle,” says the chancellor, in Weddell v. Tan Ronsalaer, “better established,” or “founded on more solid considerations of equity and public utility, than that which declares that if ono man knowingly, though he does it passively by looking on, suffers another to purchase, and expend money on land, under an erroneous opinion of his title, without making known his claim, ho shall not afterward bo permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience would 299] be bound by such ^equitable estoppel.” 1 Johns. Ch. 353. Many authorities are cited in support of this position, and it must *300 be considered, not only as a salutary, but a well-established rule of equity, and is sustained by many analogous cases.
It remains to be considered, whether the complainants, have brought themselves within it. The evidence is, that while the complainants, were expending their money in the erection of their mills, Schmucker and the Willsons were in utter ignorance that they possessed any rights to the use of the waters of the stream, until both the canal and the complainants’ mills were supplied. Is a man compelled to disclose his rights, or lose them, when he is not conscious they exist? Such a position is sustained by no authority. It is, firstly, the knowledge, and, secondly, the concealment, which estops one from setting up his title. It is fraudulent so to act, and against such conduct equity will relieve, where the other party goes on under an erroneous opinion of his rights, and expends his money. The complainants do not, however, appear to us to occupy this position. The acting commissioner’s deposition must be laid entirely out of the question, before we can adopt any such conclusions. He swears that, at the execution of the lease, he advised them that lie did not assume to sell anything but the surplus water in the feeder, etc., and the lease itself shows that such surplus water, and the use of the feeder to flow more, was all that it imports to convey. If the complainants believed they purchased anything more, and that the state had a right to convey it, their silence as to the clause in the lease, “ so far as the rights and interests of the state are concerned," and their not objecting to it, are unexplained, and are, in fact, irreconcilable with any other hypothesis than a full knowledge of the rights they thus acquired.
The remaining point requires but little more than a single remark. A right to the use of this water is asserted by the complainants, by reason of an occupancy of more than twenty-one years by the Yan Buskirks. There is no evidence, however, to sustain any such claim. An occupancy to confer title must continue, at least, substantially in the same mode. If the ^complain- [300 ants had acquired the right to set back the water, and overflow the defendant’s mill sité, and render the wheels of the mill powerless, by more than twenty-one years’ exercise of such right, they could not, at pleasure, change that right by the substitution of a new one, and draw the water from the stream above^the respondents’ mill, 2 McCord, 450 ; Yelverton, 163. Such rights must be strictly construed.
*301 On all th© grounds assumed for relief, wo are, therefore, clear in the opinion that the bill ought to be dismissed, with costs; but without prejudice to any legal rights of the complainants.
Bill dismissed.†

Where a dam is erected on an ancient stream, to obtain a head of water for the use of a state canal, the surplus waters of the stream not wanted for public use, and which continue to flow over the dam and down the ancient channel, can not legally be diverted, by a lessee of the surplus waters of the canal, to the injury of the owners of mill privileges on the stream below the dam.
But no person, except by the authority of the legislature, or of the authorized agents of the state, has a right to tap the state dam and draw off the surplus water of the artificial pond, which is created by such dam, for public purposes. Varick v. Smith et al., 5 Paige, 137.