W. H. KYLE, GUARDIAN, ETC., v. TEXAS & NEW ORLEANS R'Y CO.

(No. 2583.)

APPEAL from Jefferson County.   Opinion by WHITE, P. J.

DOUGLASS & LANIER and HAL. W. GREER, counsel for appellant.

O'BRIEN & JOHN, counsel for appellee.

§ 436. *Right of way for railroad; cannot be condemned for a lateral line not embraced in the charter; case stated.* This record presents an agreed case under the provisions of article 1293, Revised Statutes.   Proceedings were instituted by the railroad company to condemn, for right-of-way purposes, fifteen feet in width and sixty feet across lot No. 94, in block No. 15, in the town of Beaumont, Jefferson county, Texas.   The agreed statement of facts

shows that the railroad company, in accordance with its charter, and in pursuance to the laws of the state of Texas, built, equipped and finished the construction of its main line from the western limits of the city of Beaumont to and across the Neches river on the east (said river being the eastern city limit) in 1859, and reconstructed it in 1876, and since then and is now operating its said road on the line of its right of way, in and through Beaumont, which was then acquired; and that its charter authorized it to build its said railroad from the city of Houston to the Louisiana line, at or near the town of Orange.   This was all that was shown as to its charter rights. And, as to its right of way, the map incorporated in the agreed statement of the case shows the company acquired its right of way from the western town limits to the Neches river at and before the year 1876, and that the property now sought to be condemned lies outside of, and is not included in, said right of way, and would not be so included if the company were to extend its right of way to the statutory limit of two hundred feet.   It is also shown that the object for which this condemnation is sought is to operate a lateral line or switch running off or away from the main line the distance of about one-half a mile to the Reliance Lumber Company's saw-mill, planing-mill and lumber-yards, and to Long's Manufacturing Company's shingle-mill and shingle-yards, and to a wharf on Brake's bayou (which bayou connects with the Neches river), in order to deliver freights to and receive freights from said places, the said wharf being the property of the said railroad company and operated by it; that the Reliance Lumber Company and the Long Manufacturing Company are private concerns operated for private profit, and the freight to be delivered to and from the wharf was to be delivered to and received from private vessels operated for private profit, up and down the Neches river, the freight to such vessels being such as was consigned to or shipped by said railroad company. There was no proof that the charter of the railway com-

pany authorized the building of such a lateral line or switch, unless such authority is conferred by the general statutes, without requiring the company to file an amended charter for the purpose. No such amendment was proven. As to the authority of the railroad company in the premises, all our information is derived from the allegation in its petition "that under and by virtue of the laws of the state of Texas, as well as by the terms of its charter, said railroad company is authorized to take, hold and condemn any property that is necessary for the purpose of construction, operation and maintenance of its said railroad."

It is made to appear further by the agreed statement that this lateral line does not connect with the main line of road except at the one point where it diverges to go to the mills and wharf. It cannot properly be called a "switch," "siding" nor "turn-out," but is rather an independent line or "spur," branching off from the main line, the *termini* being the point of divergence from the main line, and at the mills and wharf. This "spur" was built by the railroad company in 1876, after the main line had been constructed and operated for years, and its right of way across the lot in question was a parol grant or permission of the owner that it might be used for a period of ten years. Said verbal or parol permission expired by its own terms on the 26th of November, 1886; and the present owner refusing to further grant or sell said right of way, the railroad company brought this proceeding to condemn, and by the judgment of the lower court the property has been condemned for said right-of-way purposes. The owner appeals from that judgment; and the sole question for our determination is, "Under its charter and franchises, and the laws of the state of Texas, when applied to the facts stated, can the Texas & New Orleans Railroad Company condemn the land in question?" As above stated, the right of way of the main line of the road had been acquired and established, and the main line constructed and operated

upon it,· a number of years before this lateral line was sought to be constructed and operated. The power of eminent domain was invoked and exercised in the construction of said main line. "The power of eminent domain," says that standard author, Mr. Mills, "delegated by legislative enactment is exhausted after one exercise. The corporation should foresee and provide for the increase of its business. To admit the right to successive exercises of the power would be to subject all the land in the state to condemnation at any future time." [Mills on Em. Dom. § 58.] Mr. Pierce, however, says, "the power to take property may be limited to the original construction of the road, or it may, where such appears to be the intent of the statute, authorize appropriations from time to time to supply the demands of increased business." [Pierce on Railroads, p. 150.] And in Fisher v. R'y Co. 104 Ill. 323, it was held that "where a railway company had a · side track for many years before, connecting its main track with a public warehouse and elevator in a town, over the land of another, but without having the right of way therefor except by the mere consent or license of the owner, the company had the right to institute proceedings to condemn the land over which such branch ran for right of way." We are not aware that this question has ever been directly adjudicated in this state upon our statutes. It is not one of the points relied upon by appellant, and its decision is not necessary in this case.

Before proceeding to the investigation of the main question it may be well to notice the position urged by appellee in the able brief of counsel, to the effect that appellant is estopped, in law, from denying the right of the railroad company to use, occupy and enjoy the right of way over the lot, because it had enjoyed and exercised said right for ten years and more with the permission and under verbal authority of the former owner, and that such permission could not now be repudiated by the present owner. As authority supporting this

position we are cited to the case of R'y Co. v. Jarrell, 60 Tex. 267. The cases are not at all analogous. In that case the owner gave permission to the company to enter upon and occupy the land for right-of-way purposes, and after it had done so he endeavored to repudiate his grant and oust the company from possession by an action of trespass to try title. It was held that he was estopped. Here the permission to use and occupy a right of way across the lot was expressly limited to ten years' duration, and so accepted by the company; and at the expiration of the term the owner was not estopped from terminating the permission or grant and reclaiming his rights in and to the property.

Returning to the main question. Our constitutional provision for the exercise of the right of eminent domain applies only to property "taken, damaged or destroyed for, or applied to, public use." [Const. art. 1, sec. 17.] Such right is a necessary attribute and incident of sovereignty inherent in the state, but it is one also which the state "may delegate to corporations or individuals by general laws, making proper provisions for compensation and for determining the character of the use to which it is to be applied. But the power must be strictly pursued." [1 Wood on R'y Law, § 640.] A railroad for travel and transportation for the country at large is a "public use" [R'y Co. v. Ferris, 26 Tex. 588], and our statutes wisely provide for the exercise of the right of eminent domain by such corporations. But, says Mr. Cooley, "the powers granted by such statutes are not to be enlarged by intendment, especially where they are being exercised by a corporation by way of appropriation of land for its corporate purposes. There is no rule more familiar, or better settled, than this: that grants of corporate power, being in derogation of common right, are to be strictly construed; and this is especially the case where the power claimed is a delegation of the right of eminent domain — one of the highest powers of sovereignty pertaining to the state, and interfering most seri-

ously and vexatiously with the ordinary rights of property." [Cooley on Const. Lim. (4th ed.) p. 660.] And again, says the same learned author, "The definition given of the right of eminent domain implies that the purpose for which it may be exercised must not be a mere private purpose; and it is conceded on all hands that the legislature has no power in any case to take the property of one individual and pass it over to another, without reference to some use to which it is to be applied for the public benefit. The right of eminent domain does not imply the right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will be in no way promoted by such transfer." [Id. p. 661.]

Railroad corporations, under our constitution and statutes, are declared to "have the right to construct and operate a railroad between any points within this state," etc. [Const. art. 10, sec. 1; R. S. art. 4166.] By article 4180, Revised Statutes, a railroad corporation is empowered to condemn "real estate, or the material thereon, required for the purposes of its incorporation, or the transaction of its business, for its depots, station buildings, machine and repair shops, or for the right of way, or any other lawful business connected with or necessary to the building, operating or running of its road."

The right can only be exercised where the property is required for the purposes of the incorporation or the transaction of its business, etc., or any other lawful business connected with or necessary to the building, operating or running of its road. It is manifest that turn-outs, side tracks, turn-tables, etc., are necessary to the transaction of its business, as well as to the operating and running of a railroad. "But," says Mr. Wood, "under the power of an incorporated railway company to condemn land necessary for side tracks, turn-outs and switches, it has no right to take land for the construction of an independent branch road to subserve only mere

private interests." [1 Wood's R'y Law, p. 653.] And in note 1 on said page it is said, "in Pennsylvania and Maryland there are special statutes authorizing the construction of branch roads to mines," etc. But in the absence of a statute conferring such right it could not be exercised. Such branches are such incidents of the trunk line that they can be built under the charter for a main line. The constitutionality of such statutes is discussed at some length in Getz' Appeal, a Pennsylvania case reported in 3 Am. & Eng. Railroad Cases, p. 186, with a valuable note appended by the reporter in which the leading cases *pro* and *con* are collected, with his conclusion deduced therefrom, which is that the preponderance of authority is against the correctness of the decision in the Getz case. In the Getz case Judge Turnkey delivered a dissenting opinion, and his observations are so pertinent to the facts of the case before us, and so much in accord with our view of what the law should be and is, that we quote from his opinion as follows: "Here is the naked fact of running a siding, as it is called, across the plaintiffs' lot against their will, for private gain, to a rolling-mill. This siding is not for public use. Its terminus is on private property. If the defendant may lawfully construct it, it may arbitrarily run its sidings to every private place it chooses, doing irreparable mischief to owners of property who are in the way. In Reading, to-day, the plaintiffs' dwelling and business are destroyed in laying a siding to a rolling-mill; to-morrow, another citizen may be ruined by a siding to an ice-house; another, by one to a tannery; and so on indefinitely. Other companies have like powers with this defendant. In Philadelphia, dwellings may be demolished in running sidings to sugar refineries, shoe factories, shops and sales-rooms, and other private places, at the arbitrary direction of the several boards of directors. I am not convinced that it was the legislative intent to grant such rights, and do not believe they have been granted. But, if within the words of the statutes or

charters, it seems to me a gross violation of the citizen's rights that his property should be violently taken for private use." In Railway Co. v. Benwood, recently (1888) decided by the supreme court of appeals of West Virginia, this subject is ably discussed and all the leading cases are reviewed, and the conclusion reached and announced that a railroad corporation cannot condemn land for right of way for a switch to a steam-mill, for the purpose of transporting freight to and from said mill, that not being a "public use." In the Matter of Albany Street, 11 Wend. 149, Chief Justice Savage said: "The constitution, by authorizing the appropriation of private property to public use, impliedly declares that for any other use private property shall not be taken from one and applied to the private use of another." In Bloodgood v. Railway Co. 18 Wend. 59, it is said that the words of the constitution should be construed "as equivalent to a constitutional declaration that private property, without the consent of the owner, shall be taken *only* for the public use." [See, also, to the same effect, Taylor v. Porter, 4 Hill, 140; Railway Co. v. Brainard, 9 N. Y. 108; Reeves v. Treasurer, 8 Ohio St. 346; Varick v. Smith, 5 Paige, 137; Sedgw. on Const. Law, 514, 516; Bradley v. Railway Co. 21 Conn. 305. And see other authorities collated in note 2, p. 661, Cooley's Const. Lim., and 7 Wait's Act. & Def. p. 567, § 3.]

"The question as to whether or not a use is public, so that private property may be taken for its promotion, is *prima facie* for the legislature, but is subject to final revision by the courts. Indeed, the question as to whether the use is of such a public character as to warrant this extraordinary power is always open to and dependent upon the decisions of the courts." [1 Wood's R'y Law, p. 659.]

"Statutes delegating the right of eminent domain to railroad and other corporations for public use, being in derogation of common right, are not to be extended by implication, and must be strictly complied with. They

are not to be construed so literally as to defeat the evident purposes of the legislature, but the powers granted will extend no further than is expressly stated in the act, or than is necessary to accomplish its general scope and purpose. If there remains a doubt as to the extent of the power, after all reasonable intendments in its favor, the doubt will be solved adversely to the claim of power. And the proper limit to the power is the reasonable necessity of the corporation in the discharge of its duty to the public. A corporation can exercise a delegated power to take private property for public use only in so far as the statute delegating such power plainly confers it." [1 Wood's R'y Law, p. 643; 1 Rorer on Law of R'ys, pp. 298, 299.]

Applying these well-established principles of law to the facts as agreed upon in this case, and giving to our constitutional and statutory provisions such construction as should be given them under the authorities cited above, we feel assured that the right conferred upon railroad corporations in the use and exercise of the power of eminent domain does not extend to and embrace the power sought to be exercised by the corporation in this instance. The proposed line for which the condemnation is sought is a lateral line, not "necessary for the purpose of construction, operation and maintenance of its said railroad," nor is it "required for the purposes of the incorporation or the transaction of its business" on its main line. The purposes to be subserved by said lateral line are not public in any sense, but are exclusively in the interest of and for the private benefit of private parties and of the corporation. The judgment of the lower court condemning the right of way over said lot is reversed, and the proceeding for condemnation is dismissed at the cost of appellee.

February 13, 1889.       Reversed and rendered.