THE PEOPLE *ex rel.* GREEN *vs.* MICHIGAN SOUTHERN RAILROAD COMPANY.

Certain lands lying east of the village of Hillsdale, were in the year 1838 taken and appropriated by the State for the use of the Michigan Southern Railroad, which was completed and brought into use over said lands in 1844, and in 1846 all the right, title and interest of the State, in the Railroad, was transferred to the Michigan Southern Railroad Company. *Held,* that under the law in force in 1838, providing for the acquisition of lands for the purposes of railroads, and the settlement of claims for damages for the appropriation of private property for such uses, the lands in question vested in the State, whether the claim for damages for their appropriation was extinguished or not; and that the transfer of the road by the State to the Company, imposed upon the latter no obligation to pay said damages; that the Company took such lands clear of any encumbrance or lien thereon for such claim, and that under its charter the Company had no power to assess such damages.

Whether the owner is barred of his claim to compensation by his neglect to prefer the same to the officers of the State for adjustment, *quere.*

The provisions of the several acts of the Legislature, relating to the appropria- tion of lands for the purposes of railroads, and the settlement of claims for damages therefor, reviewed.

Private property may be taken for public use without stipulation between the proprietor and the Legislature, or the intervention of a jury or of commissioners mutually elected by the parties. It is only requisite that the just compensation of the proprietor should be ascertained by an impartial tribunal; nor is it objectionable that the proprietor has no voice in constituting such tribunal.

This was an application upon an agreed statement of facts, for a peremptory mandamus to compel the respondents to cause to be appraised and paid, the damages of the relator on account of constructing, using, and occupying their road, upon and across his land, being the w. ¼ of s. e. ¼ of sec. 17, township 7, south of range one west, in the county of Hillsdale, and lying east of the village of Hillsdale. The facts are fully stated in the opinion of the Court.

*W. T. Howell,* for relator.

*H. H. Emmons,* and *Baker & Millerd,* for respondents.

By the Court, GREEN, P. J.

The Michigan Southern Railroad was located across the, lands described in the statement of facts agreed upon, in the summer of 1838, and completed and brought into use by the State of Michigan in the year 1844, and in 1846 the respondents came into possession of the road under their charter, and have used and occupied it ever since. No damages were ever assessed, tendered, or paid on account of said Railroad crossing the lands, either by the State or the Company, and no claim for damages was ever made by the owner or occupant of the land against the State of Michigan. The relator became the owner of the land in October, 1851, since which time he has frequently applied to the said Railroad Company for compensation for his land occupied by them, or that his damages should be assessed and paid under the provisions of the charter of the respondents.

Had the State acquired the right to use these lands for the purposes of the road, prior to the sale thereof to the Michigan Southern Railroad Company in 1846 ?

If so, that right passed to the Company under their contract with the State, and is now in the respondents.

In order to determine this question, it is necessary to review the various statutes from time to time enacted by the Legislature, in regard to the acquisition of lands for the purpose of Railroads in this State, and to the settlement and payment of claims for damages on account of the appropriation of private property for such uses.

By " an act for the regulation of internal improvements, and for the appointment of a Board of Commissioners," approved March 21, 1837, (*Laws of* 1837, *p.* 193,) provision was made for the appointment of a Board of Commissioners, who were constituted supervisors of the public works of the State, and who were vested with the care and superintendence of all canals, railroads, &c., to be constructed by the State.

The 15th section vested in the Commissioners all the pow-

er necessary for the location, construction, and repair of railroads, &c., and authorized them, their agents, or those with whom they should contract, to enter upon, use, and excavate any lands that might be wanted for the site of the same, or any other purpose in the construction or repair thereof, and contained the following clause: "Every person interested in premises through or over which any canal, railroad, or other improvement may be located by and under the direction of the Board of Commissioners, and claiming damages for the same, or any other damages arising from such works, shall, within one year after the damages claimed shall have accrued, exhibit to the Board of Commissioners a statement of his claim in writing, signed by himself, his guardian or agent, specifying the nature and extent of his claim for damages, and every person neglecting or refusing to exhibit such claim within the time prescribed, shall be deemed to have surrendered to the people of this State, his interest in the premises used for the purpose aforesaid, and in the damages arising as above mentioned." In case of the presentation of any such claim, ample provision was made for its adjustment, and for payment of the same out of the State Treasury.

This act was in force when the Southern Railroad was located across the lands now owned by the relator, and continued in force until the 20th of April, 1839, when an act with the same title was passed and approved, and the former act was repealed. (*Laws of* 1839, *p.* 190.) By section 24 of the latter act, provision is made for the appointment of commissioners to appraise damages on the lines of the several works of internal improvements, and whose duty it was, at the request of the commissioners of internal improvement, or claimants of damages on any part of the public works which might be ordered to be prepared for letting to contract or theretofore let, to proceed to examine the lands, buildings or materials wanted or taken by the State, &c., and to determine the amount due to such claimant, and certify the same, &c.

Provision is also made by this section for the payment of such damages when ascertained and certified in the manner· therein provided.

On the 25th of March, 1840, the Legislature passed " an act for the regulation of internal improvements," by which, a new system for carrying on and conducting the railroads of the State was adopted, and provision was made for the annual appointment of three appraisers of damages, whose duty it was, among other things, to assess the value of any land or other property required, or which might theretofore have been taken by the State, for the construction, use or maintenance of any public work, &c. (*Laws of* 1840, *p.* 97, § 16.) This act also made provision for paying the damages assessed in pursuance thereof. It differs in some respects in regard to the appraisal of damages, from the former statutes upon that subject. The appraisers were required to proceed to examine and assess damages at the request of the Board of Commissioners, or any acting commissioner, and were not authorized to do so upon the request of the claimant. It also contains a proviso which seems to import that the land or other property appraised, was not to be entered upon and used until the amount awarded by the appraisers should have been tendered. See § 16, Laws of 1840, pp. 97, 98. This clause, however, had relation to lands and property *to be* taken pursuant to that act, and not to such as had already *been* condemned, and was then used and occupied by the State under previous statutes. In other words, it did not divest the State of any right already acquired to lands or other property for the purpose of public works.

By an amendment of the last mentioned act, approved February 17th, 1842, (*Laws of* 1842, *p.* 123,) the board of internal improvement was authorized and required, upon the application of any claimant, to examine, adjust and settle, all legal and equitable claims legitimately preferred against the State, arising from or connected with the several works of internal improvement.

The next act having any bearing upon the rights of the parties in this case, was that of March 8, 1843, entitled "an act for the final adjustment of all unsettled claims for damages growing out of the internal improvements of this State." (Laws 1843, p. 153.)

This act required the Board of State Auditors, within sixty days after its passage, to cause public notice to be given by newspaper publication, for not less than eight successive weeks, to all persons claiming damages of the State, on account of or in any way arising from the construction of works of internal improvement prior to the first day of April, 1842, to appear before said board and prosecute their several claims to final determination and adjustment; and it provided that every claimant for such damages, who should not so appear before the first day of October then next, and prosecute his claim, should ever thereafter be barred from any recovery thereon. The board was duly empowered to examine and adjust all claims presented, and provision was made for the payment of all damages awarded by the board, out of the State Treasury.

By an act to amend the last mentioned statute, approved February 20, 1844, (Laws of 1844, p. 15,) the Board of Auditors were required to meet on the first Monday in the month of April and October, in each year, and to determine fully all matters submitted to them, touching any and all claims that might come before them by virtue of said act, and those who had failed to present their claims, or whose claims were not adjusted before the first day of October, 1843, were authorized to present the same to the Board of State Auditors for final adjustment, at any time within one year from the passage of the amendatory act. This last mentioned amendatory act was amended by an act approved February 12, 1846, (Laws of 1846, p. 10,) by which it was provided that every person who did not present his claim to, or whose claim was not adjusted by the Board of State Auditors, be-

fore the 20th day of February, 1845, might present the same to said Board for final adjustment at any time within one year from the passage of that act.

These statutes are all that have any bearing in determining *the right of the State* to the lands in question at the time of the transfer of the road to the respondents.

By the case agreed upon between the parties, it appears that the land was taken and appropriated by the State for the public use, in the summer of 1838.

The road was located across the land at that time, and though not completed and brought into use until 1844, we must presume that from the time of the location of the road until its completion, the State was progressing with the work, and held and possessed the land for the use of the road.

Upon the condemnation of the land and its appropriation to the public use, the claim of the owner for damages, and for all the damages resulting from its appropriation and use by the State, was at once perfect. (*The People* vs. *Hayden*, 6 *Hill*, 359.) The claim for damages resulting from the taking of the land in question, must then be regarded as having accrued in the year 1838. The State could not, however, lawfully take and hold the property of the citizen for public use, without just compensation. (*Const. of* 1835, *Art.* 18, § 9.) It has been held that it is not necessary, within this constitutional provision, that the amount of compensation should be actually ascertained and paid, before property is thus taken; but it is necessary, even when the property is taken by the State itself, that certain and ample provision should be made by law, (except in cases of public emergency,) so that the owner can coerce payment through the judicial tribunals, or otherwise, without unreasonable or unnecessary delay. (*Bloodgood* vs. *The M. & H. R. R. Co.*, 18 *Wend.* 9; *The People* vs. *Hayden*, 6 *Hill*, 361.) It seems only necessary to inquire whether the law of 1837, under which the land was taken, furnished to the owner such an

adequate and complete remedy for his damages, as he could enforce without unreasonable or unnecessary delay. By that law, every person interested in premises through or over which any canal, railroad, &c., should be located, and claiming damages for the same, was authorized and required, within one year after the damages claimed should have accrued, to exhibit a statement thereof to the Board of Commissioners; but if he neglected or refused to do so, he was to be deemed to have surrendered to the people of the State his interest in the premises used for the purposes aforesaid, and in the damages arising as above mentioned. Upon the presentation of a claim, the commissioners were authorized to agree with the claimant as to the amount of his damages; or, if an agreement could not be made, the claimant was authorized to select one discreet freeholder of the county in which the damages arose, and the board were required to appoint another, and the two thus chosen were to select a third to act with them in appraising the damages so claimed. These appraisers, after taking the constitutional oath of office, were required to proceed to ascertain and determine the amount of damages to which the claimant was entitled, and certify the same; and such amount was thereupon to be paid on the order of the commissioner, out of the State Treasury.

The mode of ascertaining and determining the amount of such claim was direct, simple, and not necessarily attended with any unreasonable delay, and the owner of the land could have coerced payment through the judicial tribunals, if the officers of the State should have failed to perform their duties.

Before the expiration of the year allowed by the law of 1837, for presenting the claim for damages, that law was repealed by the act of 1839, which provided an equally ample and sure mode of ascertaining the just amount of damages, and an equally efficient mode of obtaining payment out of the State Treasury, and it contained no limitation of time

within which the claim must be presented. Regarding these statutes as sufficiently providing for compensation to the owners of the land, and being satisfied, as we are, of the soundness of the doctrine laid down in the cases in 6th Hill and 18th Wendell, before cited upon this question, it follows that the State had acquired the right to use and hold the lands in question, for the purposes of the railroad, prior to the time of the transfer thereof to the respondents, and that it then had the power to transfer the same.

It is only necessary to look at the subsequent legislation in relation to this class of claims, in order to determine whether the right which the owner of the land once had to compensation has been barred, in consequence of his neglect, or refusal to present it to the officers of the State for adjustment. But that is not material in the controversy between the present parties, for it makes no difference in the present controversy, whether the claim for *damages* against the State has been barred, or whether it still exists.

The land became vested in the State for the purposes of the railroad, whether the claim for damages was extinguished or not, and the transfer of the land by the State to the respondents, created no obligation or duty on their part to assume or pay any indebtedness, or to discharge any obligation resting upon the State to respond in damages unless there is some express stipulation in their charter to that effect, and I have looked in vain for any such provision. The claim for damages is not an incumbrance or lien upon the land, when lawfully acquired by the State, nor does it in any way affect the title thereto in the hands of its grantees, and if the respondents are in any way liable for such damages, they have no power to assess them. It is only in case it should at any time happen that the Company should be in possession or occupancy of any land, the title to which, or the full right of use and occupancy whereof, for the purposes of said Company, should not have been duly relinquished to, or vested in

said Company, that they have any power to execute an inquisition of damages east of Hillsdale, except upon any new track that might be located by them. (*Laws of* 1846, *pp.* 175, 182.)

But it is claimed by the counsel for the relator, that the laws above referred to, so far as they provide for the appraisal of property, were void under the Constitution, and it is insisted that private property cannot be taken for public use except:

1. By stipulation between the Legislature and the proprietor; or,

2. By commissioners mutually elected by the parties; or,

3. By the intervention of a jury.

This assumption is not grounded upon any provision of the Constitution, indicating the mode by which the compensation to which the owner of property taken for public use is entitled, shall be determined, but must rest solely upon the supposition that it is only in one of these modes, that such compensation will be fairly and justly ascertained. That the proprietor whose land is taken for public use is entitled to have his just compensation therefor, ascertained by a fair and impartial tribunal, is certainly reasonable, and undoubtedly required by the spirit of the Constitution; but it is no objection to that tribunal that the proprietor had no direct voice in designating the individuals who should constitute it.

There can be no presumption that the Commissioners required by the act of 1839, to be appointed by the Governor to appraise damages on the lines of the several works of internal improvement in this State, would be likely to lean more strongly in favor of the interests of the people of the State, than in favor of the interests of the individual claimant.

As between the people and the proprietor of the property taken, they may safely be regarded as impartial, for we can conceive of no motive which they could have had to be oth-

erwise. Practically, if either party had any advantage, it was the claimant of damages, for men holding places of public trust and responsibility, and impressed as all must be with the imperfection of human judgment, and their liability to err, will be more likely to lean in favor of the individual who would suffer a palpable injury from a wrong, however unintentional, than in favor of the public by whom it would never be felt. If such a mode of adjusting claims of this kind is unconstitutional, the same objection would exist to the competency of any of the higher judicial tribunals of the State, for at the time when the land of the relator was taken for the use of the State, and for several years afterwards, the Judges of the Court of last resort, and which had a supervisory power over all inferior Courts and judicial tribunals, were appointed by the Governor alone, by and with the advice and consent of the Senate.

The case referred to by counsel, Van Horn's Lessee *vs.* Dorrance, (2 *Dall.* 304,) was not even where private property was taken for *public use,* but where the property of one citizen was attempted to be taken and transferred to another citizen, and if the judge who delivered the charge to the jury in that case intended to lay down the principle contended for in behalf of the relator here, as applicable to a case where the property is taken by a State in the legitimate exercise of its right of eminent domain for the public use, we think it cannot be sustained by reason or authority; certainly neither the case of Gardner *vs.* Newburgh, (2 *J. Ch. R.* 162,) nor that of Varick *vs.* Smith, (5 *Paige,* 137,) referred to by counsel for relator, contains any such doctrine.

The Legislature could not compel the owner of the property to claim the damages to which he might have been entitled. But it did all that it could do. It invited him to present it for adjustment, and provided for ascertaining the amount justly due, and its prompt payment. Eight years elapsed after the land was appropriated by the State, before

the road was transferred to the respondents, and no claim was ever presented against the State. If the claim has become barred under the statutes in that behalf enacted, after so long a neglect to avail himself of his rights, it may fairly be presumed that the former owner did not think he had any just claim against the State, on account of the taking of a small portion of his land for the public use, when in all probability he was more than compensated by the benefit which he derived from the construction of a great work of internal improvement that greatly advanced the value of the remaining portion of his land. However this may be, the relator has no claim against the respondents to have his damages assessed under any provision of their charter, and the motion for a mandamus must therefore be denied.