# REPORTS.

## GRAFTON,

### DECEMBER TERM, A. D. 1855.

ABBOT & a. v. JOHNSON & a.

If several persons enter into a written agreement of partnership, and the majority alter the agreement in a material point, those who do not assent may retire from the firm, provided they do it within a reasonable time, and under reasonable circumstances.

If the written articles stipulated that there shall be no trade in spirituous liquors, and they are so changed as to allow such trade, it is a material alteration, which will warrant a partner in withdrawing from the firm.

If upon such alteration two partners retire, and the others, continuing the business of the firm, contract a debt, and by collusion with the creditor procured the retired members to be sued at law as partners with themselves, and judgment to be recovered, and separate sums to be collected on the execution from each of the retired members, they may join in a bill for relief against the actual members of the partnership.

Where mutifariousness appears on the face of the bill, the defendant must take the objection by demurrer, and cannot insist on it at the hearing after answer. But if the objection of multifariousness or surrejoinder does not appear on the bill, but is shewn by the answer, it is open to the defendant on the hearing.

BILL IN EQUITY. The complainants, Abbot and Hunt, state in their bill substantially as follows: In the summer of 1839 it was proposed by sundry individuals to form a partnership, or joint stock company, for the purpose of carrying on a retail trade at Bath Lower Village, in domestic and foreign goods, and, to carry this purpose into effect, proposals were drawn up and signed by the plaintiffs and by the defendant, to the number of about fifty. By these written articles the subscribers agreed to become

partners in a firm to be styled the " Farmers' and Mechanics' Store," and to pay in the several sums annexed to their respective names, and at such times as the stockholders might direct; provided the sum of three thousand dollars was subscribed and paid in before commencing business; each subscriber to be a partner, and to share in profit and loss in proportion to the sum by him subscribed and paid in, and no note to be received for stock subscribed, unless secured to the acceptance of the executive committee by at least two responsible indorsers; a committee of five stockholders to be chosen at the annual meeting, to be called the executive committee; the articles not to be altered or amended, except by a vote of two thirds of the stockholders, at a meeting convened for that special purpose, by the executive committee. If any stockholder might wish to withdraw from the firm, he should be permitted so to do, taking the amount by him paid in, by giving six months' notice of his intention, to the executive committee, in writing; and by the 12th article it was provided that there should be " neither purchase nor sale of ardent spirits by the concern."

The complainants were always ready and desirous to carry these proposals into effect, according to their strict tenor and import, and to pay in each his subscription of one hundred dollars. But the other subscribers, without the knowledge of Hunt, and without the consent and contrary to the remonstrance of Abbot, caused a new paper to be drawn up, in all respects like the former, with the exception of the 12th article, which prohibited dealing in spirituous liquors, and inserted in place of it the following: " If the executive committee shall see fit to purchase and sell ardent spirits, none of the same shall be retailed for the purpose of being drunk in the store."

The new proposals were signed by subscribers to the original proposals, except the complainant, and by four other persons. A partnership was formed according to the new proposals, by the subscribers thereto, who are the defendants, and the sums by them subscribed, paid in, to the satisfaction of the members. The company so formed carried on the exclusive business, under the

firm of the Farmers' and Mechanics' Company, including a large, disreputable and immoral traffic in ardent spirits. The complainants were frequently urged by agents of the company, both before and after their trading operations commenced, to become members, and to pay in the sums which they had subscribed to the first proposals, which they uniformly declined to do, alleging that they had scruples of conscience, which precluded their connection with any institution that dealt in ardent spirits. Though Abbot did, at the request of some members, assist at the meetings of a committee raised for the purpose of renting a store, and transacting other business preparatory to the formation of the partnership, yet he did so with the express condition that he should not become a member, unless the company should determine not to engage in the purchase and sale of ardent spirits; and afterward, becoming satisfied that the company would not so determine, he absented himself from the meetings of the committee, and never signed, or in any way assented to the second proposals, but declined, as aforesaid.

The company continued their business under the name of the Farmers' and Mechanics' Company near a year and a half, and dissolved in June, 1841, having a large amount of property on hand, and owing numerous debts, and among them a debt to Atkins and Stedman, who, for the recovery of their debt, commenced an action against the company, and included the complainants as members, returnable to the Court of Common Pleas for Coös County, March term, 1842, at which term most of the defendants were defaulted, and the complainants severally pleaded the general issue; but, being unable to shew the above facts, a verdict was rendered against them, and judgment rendered against them and all the other defendants to that suit, at the November term of that court, 1844.

Atkins and Stedman, on the trial of their action, exhibited in evidence the original proposals, signed by the complainants, and proved that the contract declared on was made by the agents of the Farmers' and Mechanics' Company; and the complainants, though never in fact partners, never having contributed to

the fund of the partnership, nor being entitled to profit, are estopped, as against Atkins and Stedman, to deny that they were partners. The defendants had assets of the company sufficient to pay their debts, yet procured Atkins and Stedman to prosecute these complainants after the other defendants to that suit had made default, against whom they might, with less expense and delay, have had satisfaction of their debt.

Atkins and Stedman, combining with the defendants, and at their request, sued out execution on their judgment, and levied it upon the property of the complainants, who, to prevent the sacrifice thereof, paid each the sum of one hundred dollars, in part satisfaction thereof, together with forty dollars for costs awarded against them personally.

The bill prayed that Atkins and Stedman might be enjoined against making a further levy on the property of the complainants, and for general relief. Process was prayed against Atkins and Stedman, who reside out of the State; but no service was made on them, and they did not appear.

At July term, 1845, the defendants demurred to the bill. At December term, 1845, the demurrer was overruled and the defendants ordered to answer in ninety days; and the time for filing answers was extended from time to time till November, 1847, when the answers of four of the defendants, Johnson, Woods, Ross and Childs, were filed, and agreed to be received and used as the answers of all the defendants. The complainants having excepted to the answers, the defendants, at December term, 1847, had leave to amend their answers, and filed additional answers accordingly. The complainants filed a replication, and some evidence was taken, not material to be reported. The cause having been argued at the July term, 1850, the court, at the December term, 1850, directed a further argument on the question, whether the plaintiffs were properly joined in the bill.

The answers admitted the original articles of agreement, as stated in the bill, and stated that a meeting of the subscribers, not called according to the written articles, but of which the

subscribers had actual notice, was held at " Childs' School House," in August, 1839, after more than three. thousand dollars had been subscribed, for the purpose of considering the articles and other matters, which meeting consisted of more than two thirds of the subscribers; at which meeting all the articles were approved except the 12th, and it was voted to leave that article to a committee of five, then raised, of which the complainant, Abbot, was one ; that Abbot and Hunt were at the meeting and voted to leave that article to the committee.

That this committee, including Abbot, afterward, in August or September, met at the house of W. A. Woods, for the purpose, among other things, of acting upon and disposing of the 12th article, and then voted not to adopt the article as it stood, but to substitute the provision stated in the bill, Abbot voting in the committee to retain the original 12th article : That the defendants did not consider this as a new contract, but the old contract modified in the point above mentioned : That the company went into business under the modified agreement, and dealt in ardent spirits, but not in a disreputable or immoral way, nor in violation of law : That the sum of three thousand dollars was subscribed and paid in before the business was commenced.

That Abbot and Hunt were frequently urged by the agents of the company, both before and after the business was commenced, to pay in the sums by them subscribed, which they declined to do, and never did ; but the defendants never urged them to become members, because they believed them to be already members, after signing the original articles.

That whether Abbot and Hunt alleged scruples of conscience as their reason for declining to pay in their subscriptions, the defendants have no knowledge, except Childs and Woods think that at the meeting of the committee at Woods', Abbot alleged something of that kind.

In their first answers the defendants, Woods, Childs and Ross, state that some days after the meeting at Woods', Abbot met with the committee at the Lower Village, for the purpose of hiring a store, and other things connected with the business of

the company. In their amended answers the defendants, Woods and Ross, are still of opinion that the meeting to hire the store, &c., was after the meeting at Woods'; but Childs, in his second answer, says he thinks he was under a mistake in his first, and that the meeting at the Lower Village was before that at Woods'. The answer does not state what was done, or that any thing was done at the meeting of the committee at the Lower Village. Johnson was not there, and Childs was not a member of the committee.

The answers deny that Abbot attended the meetings of the committee upon any condition, or understanding, or expressed intention, that he should not belong to the company if they dealt in ardent spirits.

The answers state that Hunt was at the meeting in June, 1841, when the company was dissolved; but when called on to vote declined; that the defendants have been informed and believe that Hunt, after he signed the articles, but whether before or after the 12th article was changed, they are not informed, stated, in presence of one or more persons, that he had become a member, and should receive a large profit from the business.

That Abbot and Hunt always favored the adoption of the original 12th article, and were always opposed to the substitute, but did not take the steps required by the constitution to withdraw, nor give any notice that they withdrew.

That before Atkins and Stedman commenced this suit, they called on the company for payment, and the executive committee of the company informed them that if they sued and did not join all whom the committee believed to be members, whose names the committee furnished to the attorney of Atkins and Stedman, including the names of the complainants, the company would plead the omission in abatement; and the committee also gave Atkins and Stedman to understand that they should be put to no additional cost or expense by including in their suit all such supposed members as denied their membership; that this was done by the committee because they believed Abbot and Hunt, and other dissenting subscribers, were in fact members of the company.

That on the trial of the action of Atkins and Stedman, Abbot and Hunt severally pleaded the general issue; but by reason that they were unable to shew the matters stated in their bill, and because, as the defendants believe, no such facts existed, a verdict was returned and judgment rendered as stated in the bill; that on the trial Atkins and Stedman exhibited in evidence the original articles of partnership, signed by Abbot and Hunt, with other proof, and also proved that the contracts declared on were made by the agents of the Farmers' and Mechanics' Company.

That the execution of Atkins and Stedman was placed in the hands of an officer for collection, who called on the company for payment, and the company, through their agents, requested the officer to collect thereon of said Abbot and Hunt the sum of one hundred dollars each, and also from each of them one half the costs of the suit, being forty dollars; that the officer levied the execution on the separate property of Abbot and Hunt, who thereupon paid to him, each of them severally for himself, and on his own account, from his individual funds, and at separate and different places and times, one hundred dollars, and one half the costs of the suit. The answers deny assets of the company sufficient for the payment of the debts.

In his amended answer Ross says that at the meeting at the house of Woods, he did not hear Abbot say to the effect that he would have nothing to do with the concern; but at that meeting he did hear him express himself to the effect that he did not wish to trade at, or would not trade at, or patronize a store where ardent spirits were sold; that other business was done at that meeting before the question was considered as to dealing in ardent spirits.

Woods, in his amended answer, says that at the same meeting he did not hear Abbot say any thing to the effect that he would have nothing to do with the concern; that Abbot expressed himself in opposition to the sale of ardent spirits, but he can not recollect the language used; that he did not hear him say any thing from which he inferred that he intended to dissolve his

connection with the company; that Abbot withdrew from that meeting before the other members of the committee; that the meeting at the Lower Village, he thinks, was after the meeting at his house; that Abbot did not attend any meeting of the committee after that at his house, except the one at the Lower Village.

Childs, in his second answer, says that he thinks the meeting of the committee at the Lower Village was before the meeting at the house of Woods; that Abbot left the meeting at Woods' before the other members of the committee.

Johnson, in his several answers, says that he was not present at the meeting of the subscribers, nor at any meeting of the committee mentioned by the other defendants, and has no personal knowledge of what was done at any of those meetings.

The defendants, in their answers, insisted on the objection of multifariousness, or misjoinder.

*Livermore*, for the plaintiff, to the point that the plaintiffs were not partners in the firm of the Farmers' and Mechanics' Company, cited *Vice* v. *Lady Anson*, 7 Barn. & Cress. 409; S. C., 3 Car. & P. 10; *Brown* v. *Freeth*, 9 Barn. & Cress. 632. On the question of multifariousness he cited *Campbell* v. *Mackay*, 1 Milne & Cr. 603; *Hutchins* v. *Congreve*, 4 Russell 562; *Plain* v. *Agar*, 1 Simmons 34, and 2 Simmons 289; Story's Equity Pl., § 286 and 530; *Oliver* v. *Piatt*, 3 Howard 333; *Watertown* v. *Cowen*, 4 Paige 410; *Cuyler* v. *Elnsworth*, 6 Paige 32; Story on Partnership 135; *Langan* v. *Smith*, 2 Phillips 301; *Parker* v. *Peters*, 5 Beav. 253; *Brown* v. *De Tastel*, Jac. 284; *Smith* v. *Snow*, 3 Mad. 10; *Att. Gen.* v. *Wiburg*, 1 Peere Will. 599; *Kensington* v. *White*, 3 Price 164; *Maddison* v. *Wallace*, 2 Dana 61; *Rowley* v. *Adams*, 6 L. & Equity Reps. 124; *Brinkerhoof* v. *Brown*, 6 Johns. Ch. 139; *Ward* v. *Duke of Northumberland*, 2 Anst. 469; *Gain* v. *Chew*, 2 Howard 643.

*C. K. Morrison* and *H. Hibbard*, for the defendants, to the point that the plaintiffs were partners with the defendants in

the Farmers' and Mechanics' Company, cited *Atkins & a.* v. *Hunt & a.*, 14 N. H. Rep. 205 ; *Hollister* v. *Barkley*, 11 N. H. Rep. 501 ; *George* v. *Harris*, 4 N. H. Rep. 533 ; Story on Partnership, § 275, 276, and note, and 287 ; *Pierpont* v. *Graham*, 4 W. C. Rep. 234 ; Daniel's Ch. Practice 983, 985, and note ; Chitty on Contracts 259 ; *Arnold* v. *Brown*, 24 Pick. 89. To the point that the plaintiffs were not well joined, they cited *Yeaton* v. *Lenox*, 8 Pet. 123 ; Daniel's Ch. Practice 291, 350, 384, 391, 395 and 396 ; *Harrison* v. *Hogg*, 2 Vesey, Jr., 324 ; Story's Equity Pl., § 161, note, 237, 286, note, 279, 281, 232, 537, *a*, and note 1, 277 ; *Hudson* v. *Maddison*, 12 Simmons 416 ; *Boyd* v. *Hoyt*, 6 Paige 65 ; *Bryan* v. *Blythe*, 4 Black. 249 ; *Anderson* v. *Wallace*, 4 Younge & Coll 336 ; *Jones* v. *Del Rio*, 1 Turner & Russell 297 ; *Dias* v. *Bouchard*, 10 Paige 444 ; *Tappan* v. *Evans*, 11 N. H. Rep. 327 ; Mitford's Pl. 281, 282 ; *West* v. *Randall*, 2 Mason 181 ; 1 Chitty's Pl. 11.

They also contended that the multifariousness did not appear on the face of the bill, as it did in the answers and evidence, and that the defendants might insist on that objection on the hearing after answer ; and to this point they cited Mitford's Pl. 306, 308, 361 ; *Goodrich* v. *Pendleton*, 4 Johns. Ch. 549 ; Story's Equity Pl., § 237, 660 ; *Oliver* v. *Piatt*, 3 Howard 333 ; *Cowley* v. *Cowley*, 9 Simmons 299 ; Daniel's Ch. Practice 397 ; *Greenwood* v. *Churchill*, 1 M. & R. 559.

PERLEY, C. J. It has been decided on the demurrer that the complainants, in their bill, state a case which entitles them to relief. The answers very fully admit the general arrangement alleged to have been made between the defendants and Atkins & Stedman, by which the plaintiffs were sued in the action at law, and charged as partners in the firm of the Farmers' and Mechanics' Company, and that the execution, which was issued on the judgment recovered in that suit, was levied on their property, and in part paid by them. They also admit that the original contract of partnership, signed by the plaintiffs, was produced by Atkins and Stedman as the agreement under which

the business of the company was transacted, and that the original agreement had been altered in the manner stated in the bill, before the business of the company was commenced.

Two principal questions remain to be settled: 1. Were the complainants partners with the defendants in the Farmers' and Mechanics' Company ? 2. Are they properly joined as plaintiffs in this suit ?

The case in the action at law of *Atkins & a.* v. *Hunt & a.,* reported 14 N. H. Rep. 206, has been cited as an authority to shew that the complainants are to be regarded in this suit as partners with the defendants in the firm of the Farmers' and Mechanics' Company ; but the point of the complaint in this bill is, that by collusion and contrivance between the defendants and the plaintiffs in that suit, the real facts of that case were suppressed, and a judgment thereby procured contrary to equity, and the object of this bill is to obtain relief against the consequences of that judgment. On that case as reported it appeared that these plaintiffs signed the agreement under which the business of the firm was transacted, paid in their subscriptions to the capital stock, and were entitled to share in the profits. No mention is there made of any change in the original articles of partnership, of any objection made by the plaintiffs, or of the fact that when called on they declined to pay in their subscriptions. The learned Chief Justice, in delivering the opinion of the court, says : " There was an association doing business under a certain name ; the defendants signed the articles which constitute this association ; the defendants were subscribers, and a by-law provided that each subscriber should become a partner ; the business of the company was done in pursuance of a major vote of those present, and an agent was appointed, who purchased goods for the use of the company. Here, then, there was not simply an agreement that a partnership should be formed at some future day, but an actual, existing reality, a subscription to articles, making a present association, and a by-law designating the subscribers as partners. A right to participate in the profits of a joint concern is one of the tests of partnership, where a

Abbot *v.* Johnson.

party has fulfilled all the conditions incumbent on him to per-
form." It is quite obvious that none of the material facts, on
which the plaintiffs rely in this suit, appeared in that case.

Taking the articles of agreement signed by the plaintiffs and
defendants to have constituted an actual partnership, and not to
have been a mere agreement for a future partnership, the
contract was mutual among all the subscribers, and they were
mutually bound to abide by the terms of their agreement. If
the subscribers, or the majority, and managers, violated the
articles of partnership in any substantial point, those who dis-
sented might rescind the agreement, so far as they were con-
cerned, and withdrew from the association, provided they did it
within a reasonable time, and under reasonable circumstances.
The original articles signed by the plaintiffs stipulated that there
should be no dealing in ardent spirits. The company changed
the article which contained this stipulation, and substituted
another, under which the business of the company was actu-
ally conducted, and by virtue of which they dealt in spirituous
liquors.

It was expressly provided in the written contract signed by
the plaintiffs, that the partnership should not deal in ardent
spirits ; the company altered the contract so as to allow a trade
in ardent spirits to be carried on ; and we can have no hesitation
in holding that this was such a substantial alteration as dis-
charged the plaintiffs from their obligation to proceed with the
partnership, unless they agreed to the change, and that it gave
them the right to retire from the firm. Inasmuch as the part-
ners thought fit to make this stipulation a part of their funda-
mental agreement, we should hardly think ourselves at liberty
to enter on an inquiry whether the stipulation was in its character
a material part of the contract. It is evident that the partners
have chosen to regard it as an essential provision in their associ-
ation ; otherwise they could not have made it the subject of a
separate article in their written agreement. But if it had been
left to the judgment of the court, we should feel bound to hold
that the article in question was a material and substantial part

of the contract. The partnership was formed by a large number of neighbors, who must be supposed to feel a lively interest in the morals of the community to which they belonged. It is well known that many men entertain strong opinions on this subject of dealing in ardent spirits, and hold the traffic to be immoral. Unless there were a license, the trade would be unlawful. If the question were considered merely in a pecuniary point of view, an honest difference of opinion might well exist as to the policy of engaging in this trade. At any rate, a retail trade in a country village, connected with the sale of spirituous liquors, must be regarded as differing in a material and substantial point from a trade without it.

We must hold, therefore, that the plaintiffs were not bound by the altered articles of partnership, unless they assented to the change ; that they had a right to withdraw, if they did it under circumstances which were such as to do no injury to the partners who chose to go on under the new arrangement.

The cases are numerous to shew that when one of the parties to a contract violates it, the other may rescind it and withdraw; and the general rule is, that if the party elects in such case to rescind, he may do it, provided the other party is left *in statu quo.* *Stevens* v. *Cushing,* 1 N. H. Rep. 18 ; *Danforth* v: *Dewey,* 3 N. H. Rep. 79 ; *Wiggin* v. *Foss,* 4 N. H. Rep. 292 ; *Child* v. *Moore,* 6 N. H. Rep. 33 ; *Okell* v. *Smith,* 1 Starkie's R. 107 ; *Cash* v. *Giles,* 3 Car. & P. 407 ; *Percival* v. *Blake,* 2 Car. & P. 514 ; *Campbell* v. *Flemming,* 1 A. E. 42 ; *Kingsley* v. *Wallace,* 14 Maine 57 ; *Potter* v. *Titcomb,* 22 Maine 300 ; *Masson* v. *Bovet,* 1 Denio 69 ; *Hunt* v. *Silk,* 5 East 449 ; *Conner* v. *Henderson,* 15 Mass. 392.

The case of Hunt would seem, on this point, to be clear of difficulty. The statement of the answers, that the defendants had heard and believed that Hunt, either before or after the alteration in the articles, had said that he was a partner, if competent at all, is quite too loose to be made the foundation of a judgment ; and the fact that he was present at the meeting when the company was dissolved, and when called on to vote

as a member declined, can certainly have no tendency to shew his assent to the change, or that he admitted himself to be a partner.

With respect to Abbot, we think that the answers fail to shew that he acted on the committee with any express condition that he should not be a partner if the company dealt in ardent spirits; but did he so conduct himself as to waive his right of objecting to the alteration, and withdrawing from the association?

He was chosen on the committee to whom the question of the 12th article was referred, and he met with the committee at the meeting when they determined to change the article. He might well serve with the committee, in the hope that his opposition would prevent a change, and without implying a determination to go on with the business if spirits were bought and sold; and, if we are to take it that the meeting at the Lower Village was after the committee had determined to change the article, it was still by this substituted article to be decided by the committee whether the trade in spirits should be actually carried on. He expressed himself at all times in the meetings of the subscribers, and in the meetings of the committee, against the trade in spirits; and, though according to their answers, we must take it that the defendants do not recollect that he formally protested against the change, on the ground of his conscientious scruples; yet he stated in substance that he had such scruples against being concerned in a company that dealt in spirits. Woods and Childs say that at the meeting at the house of Woods he said something of the kind; and, according to the answer of Ross, he said he did not wish to trade, or would not trade at, or patronize a store where ardent spirits were sold. After such statements, all are at a loss to know how it could be reasonably supposed that he intended to remain in the company as a partner, if they should finally decide to trade in spirits. He met at one other time with the committee; and, allowing that this was after the committee had resolved to change the article, it was still left to the discretion of the committee whether the company should trade in spirits; and it does not appear by the answers that they had finally decided on

it when the meeting was held at the Lower Village. When called on for payment, before and after the business commenced, he refused to pay, and has never paid, or given any security, and, by the terms of the written agreement of partnership, not being paid, nor given the security required, he cannot be entitled to profits as a partner.

The court must infer from the answers that Abbot strenuously resisted the proposition to change the original articles of agreement, and uniformly objected to trading in spirits; that he alleged conscientious scruples against engaging in that trade, and in sufficiently intelligible terms declared his intention not to remain in the company if they were concerned in that trade; that it was on account of the alteration in the original contract, and the company's dealing in spirits, that he refused to pay his subscription; that he had no connection with the business or the store after the partnership went into operation.

A partner may retire from the firm by a tacit renunciation, or by implication from circumstances; no formal notice or express declaration of his intention is necessary. Story on Partnership, § 272, 273, 275. On the circumstances of this case we think, as matter of fact, that the plaintiff did withdraw from the association for a sufficient cause, in a seasonable time, and under reasonable circumstances, before any new liabilities were incurred by the partnership, and while the parties remained *in statu quo.* Nothing is shown to have been done at the Lower Village to involve the company in any additional responsibilities.

The provision of the original agreement, by which a partner, on six months' notice, was allowed to go out, and take with him his share of the capital stock, applies to a case where the partner retires according to the contract, and not to the case where he asserts the right to withdraw by rescinding it, because it has been violated by the other parties.

The question which has been found to involve the principal difficulty in this cause is, whether, as the case now stands on the bill, answer and evidence, it is multifarious; or, in other words, whether the complainants are improperly joined as plaintiffs.

It is insisted by the plaintiffs that this objection appears on the face of the bill, and having been open to the defendants on the demurrer which has been overruled, cannot now be urged on the hearing.

There would seem to be some confusion in the authorities on the point, whether a defendant may insist on multifariousness by plea or answer, or is confined to make the objection by demurrer only. In some cases it is said that the objection of multifariousness can be taken advantage of only on demurrer. *Whateley* v. *Dawson*, 1 Schoales & Lef. 370 ; *Nelson* v. *Hill*, 5 Howard 127 ; *Halstead* v. *Shepherd*, 23 Ala. 558. In other cases it is said that the objection must be taken by demurrer, plea or answer. *Oliver* v. *Piatt*, 3 Howard 333 ; *Trustees of Waterton* v. *Cowen*, 4 Paige 510.

We think it may be found that the term *multifariousness* has not always been used in the same sense, being in some instances confined to cases where a misjoinder of parties or subjects appears on the face of the bill ; and in others extended so as to include cases where the answer or plea shews a misjoinder, which was not apparent before. In cases where the answer or plea, by the denial of a fact stated in the bill, or by the introduction of a new fact, shows that there is a misjoinder, this is not, perhaps, to be considered as multifariousness in the strict sense of the term, but as a variance from the case stated in the bill. If the variance is material, the plaintiff fails, because he has not made out the case which he stated. If the objection does not appear in the bill, but is shewn by the plea or answer, it is, perhaps, not very material whether it is demonstrated multifariousness, or a misjoinder, or a variance ; the defendant must be allowed to insist on the objection by his plea or answer, as he would not do it by demurrer.

Where multifariousness appears on the face of the bill, the rule is well established by the authorities, that the defendant must make the objection by demurrer, and can not insist on it at the hearing, on plea or answer. Daniel's Ch. Practice 350, 397 ; Story's Equity Pl., § 236, 237, 271, 541, 544 ; *Powell* v.

*Arderne*, 1 Vernon 416 ; *Hester* v. *Weston*, 1 Vernon 463 ; *Whaley* v. *Dawson*, 2 Schoales & Lef. 370 ; *Greenwood* v. *Churchill*, 1 M. & K. 546 ; *Ohio* v. *Ellis*, 10 Ohio 456 ; *Grove* v. *Tresh*, 9 Gill & J. 281 ; *Bryan* v. *Blythe*, 4 Blackf. 249 ; *Nelson* v. *Hill*, 5 Howard 127 ; *Gibbs* v. *Claggett*, 2 Gill & J. 14 ; *Hickman* v. *Cook*, 3 Humphrey 640 ; *Sims* v. *Aughtery*, 4 Strob. Eq. 103.

But where the objection, whether termed multifariousness or misjoinder, or a variance from the case stated in the bill, is introduced and shewn by plea or answer, it must of course be open to the defendant in the plea or answer.

Does the ground of the defendant's objection for misjoinder or multifariousness appear in this case, on the face of the bill ?.

The answers admit the original contract, signed by the plaintiffs, and the subsequent alteration, as stated in the bill. But the bill alleges that Atkins and Stedman levied their execution " upon the property of your orators, who, to prevent a sacrifice thereof, have each paid the sum of one hundred dollars, in part satisfaction thereof, together with forty dollars for costs awarded against them personally." The answers state that the officer levied the execution " upon the separate property of said Abbot and Hunt, who thereupon paid to him, each of them severally, from his individual funds, and at separate and different places and times, the sum of one hundred dollars, and one half the costs of said suit."

The allegations of the bill are not, perhaps, free from ambiguity as to whether the forty dollars were paid jointly by both the defendants, or each paid forty dollars on that account ; but we think the fair construction of the language used in the bill is that the forty dollars were awarded against the two defendants personally, and they paid that sum jointly. The bill then alleges a joint payment by the plaintiffs, for which they would have a joint decree, if they succeeded, while the answers allege that all the payments were several and separate, for which they could not have a joint decree. Whether the payments were made at the same, or at different times and places, and whether the

levy was made on the joint or separate property of plaintiffs, would not seem to be very material. But one of the most material grounds of the defendant's objection, to wit, that there was no joint payment by the plaintiffs, for which they would be entitled to a joint decree, does not appear on the face of the bill, as it does in the answers, and we think that the defendants have the right to insist on the objection by answer or plea.

Multifariousness has been defined to be the improperly joining in one bill distinct matters, and thereby confounding them ; as, for example, the uniting in one bill matters perfectly distinct and unconnected, against one defendant, or the demand of several matters of distinct natures against several defendants in the same bill. Courts of equity in cases of this sort are anxious to preserve some analogy to the comparative simplicity of proceedings at the common law, and thus avoid confusion in their own proceedings, as well as their decrees. Story's Equity Pleading, § 271. On the other hand, it is a favorite object of equity to prevent multiplicity of suits. For this purpose it is a general rule in chancery, that all persons materially interested must be made parties. The forms of proceeding in chancery, and the power of the court to mould its decrees so as to suit the various equities of the case, enable it advantageously to settle and adjust, in a single suit, rights and interests which, according to the rules of pleading in the courts of common law, would necessarily result in various issues, incapable of being tried in a single cause, and disposed of by a single judgment. 1 Story's Equity, § 67 ; *Fellows* v. *Fellows*, 6 Cowen 699.

To prevent unnecessary multiplicity of suits, and adjust at once all the various equities existing among different parties interested in the same subject, by joining them in the same cause, courts of equity have relaxed the strict rules which prevail in suits at law, and at the same time have endeavored to prevent unnecessary hardship and expense to the parties, and confusion in the proceedings, by insisting that matters wholly· distinct and unconnected shall not be joined in the same suit. *Whaley* v. *Davison, qua supra.*

Abbot *v.* Johnson.

It is difficult to extract from the cases any general rule on this subject, of easy application in practice. Indeed, in numerous instances, courts have thought themselves driven to confess that there is no inflexible rule establishing what constitutes multifariousness, and that it must be left to the discretion of the court, according to the circumstances of each case. *Oliver* v. *Piatt,* 3 Howard 333; *Campbell* v. *McKay,* 1 Milne & Craig 621; *Carter* v. *Kerr,* 8 Blackf. 373; *McLean* v. *Lafayette Bank,* 3 McLean 415; *Marshall* v. *Means,* 12 Geo. 61; *Carroll* v. *Rosevelt,* 4 Ed. C. H. 211; *Robinson* v. *Guild,* 12 Met. 328.

It is certainly unfortunate if a matter of this practical nature must be left to the loose discretion of the court in each particular case. The difficulty, however, of laying down a positive rule of general application is unquestionable, and is quite apparent from the great number of cases in which these questions have been, and continue to be, considered. We shall refer to some of them :

A bill was held to be multifarious which included a claim against executors with a claim against the heir. *Ward* v. *Duke of Northumberland,* 2 Anst. 469, 477.

An author cannot maintain a bill against several booksellers for selling the same spurious edition of his works. *Dilly* v. *Doig,* 2 Vesey, Jr., 486. So the heir and next of kin can not join in a bill against the administrator. *Maud* v. *Acklone,* 2 Sim. 338.

In *Jones* v. *Garcia Del Rio,* 1 Turn. & Russ. 297, it was held that if several distinct holders of shares in a loan should sue in behalf of themselves and others, to have their subscriptions repaid, the bill would be multifarious.

On the other hand, there are numerous cases in which it has been held that a bill is not to be treated as multifarious because it joins two causes of complaint growing out of the same transaction, where all the defendants or plaintiffs are interested in the same claim of right, and where the relief asked for in relation to each is of the same general nature, and also where the parties, plaintiff or defendant, have one common interest touching the matter of the bill, although they claim under distinct titles, and have independent interests. Story's Eq. Pl., § 284, 285.

The same principle applies to the joinder of plaintiffs as of defendants. Story's Eq. Pl., § 279.

Thus several tenants may bring one bill against the lord of the manor for disturbance of the common. *Mayor of York* v. *Pilkington & a.* In this case it was said to be no objection that the defendants have separate defences, but the question was, whether they held a joint right to the sole fishery, which extended to all the defendants ; for, notwithstanding the general right was tried and established, the defendants might take advantage of their several exceptions, or distinct rights.

In *Campbell* v. *McKay*, 1 Milne & Craig 603, it was held that where there is a common liability and a common interest, the common liability being in the defendants, and the common interest in the plaintiffs, different grounds of complaint might be united in the same record.

If several sureties pay the debt of the principal, each in separate payments, they may join in one bill against a co-surety for contribution. *Craythorne* v. *Swinbourne*, 14 Vesey 160 ; *Young* v. *Lyons*, 8 Gill 162.

Several independent judgment creditors may join in the same bill, to be relieved against the same fraud in conveying their debtor's land to different grantees.

In *Robinson* v. *Smith & a.*, 3 Paige 231, several stockholders in the New-York Loan Company joined in the same bill against the directors for fraud. On demurrer, the objection of multifariousness was overruled. The court say: "There is no good reason for requiring them to file separate and distinct bills. It is a principal object of this court to prevent multiplicity of suits, and where several persons have a common interest arising out of the same transaction, although their interest is not joint, the defendant may sometimes insist that all should be made parties, that he may be subjected to the trouble and expense of only one litigation."

In *Clarkson* v. *DePuyster*, 3 Paige 320, it was held that if one creditor by judgment, and another by decree, have acquired liens upon the property of their debtor, which entitle them to

similar relief against one act of the defendant, which is a common injury to both, and prevents them from enforcing their liens, they may join in a bill to obtain such relief.

In *Boyd* v. *Hoyt & a.*, 5 Paige 65, it was held that in a creditor's bill, to reach property of a judgment debtor, which had been transferred fraudulently to two or more persons holding different portions of such property by distinct conveyances, they might be joined as defendants.

The complainant may join in the same bill two good causes of complaint, arising out of the same transaction, where all the defendants are interested in the same claim of right, and the relief asked for as to each is of the same nature. *Varick* v. *Smith*, 5 Paige 137. Where the general right claimed by the bill is the same as to all the defendants, their objection for multifariousness, on the ground that they have distinct and separate interests, will not be sustained. *Larkins* v. *Biddle*, 21 Ala. 252.

In *Halstead* v. *Shepherd*, 23 Ala. 558, the bill alleged that one of the defendants, being partner with the plaintiff, at different times fraudulently transferred different parts of the partnership funds to the other defendants severally, and it was held that the bill was not multifarious.

In *Martin* v. *Martin*, 13 Mis. 36, the bill was by an administrator against several children and heirs of the deceased, alleging that at several times, on the respective marriages of the defendants, their father had put in their hands different negro slaves, as a loan, and seeking to recover them back, and the bill was decided not to be multifarious.

The rule stated in *Redsole* v. *Monroe*, 5 Ired. Ch. 313, is this: If the grounds of the bill arise out of one and the same transaction, or series of transactions, forming one course of dealing, and all tending to one end, if one connected story can be told of the whole, the bill is not multifarious.

Two or more judgment creditors, having separate judgments, may join in a bill to reach the equitable interests of their debtor. *Murray* v. *Hay*, 1 Barb. Ch. 59.

It is not necessary that the interest of the parties to a bill be

the same ; it is sufficient if they have a common interest in one or more points connected with the rest. *Booth* v. *Stamper*, 10 Geo. 109 ; *Wortley* v. *Johnson*, 8 Geo. 236.

A bill in equity by several complainants, owning separate tenements, to enjoin a nuisance common to them all, is not multifarious. *Trustees of Watertown* v. *Cowen*, 4 Paige 510 ; *Murray* v. *Hay*, 1 Barb. Ch. 59 ; *Brady* v. *Weeks*, 3 Barb. Sup. Ct. 157 ; contra, *Hudson* v. *Maddison*, 12 Sim. 416.

Several judgment creditors of the same debtor, whose separate executions have been returned *nulla bona*, may join in the same bill to subject and distribute a common fund. *Bullet* v. *Stewart*, 3 B. Monroe 115.

The rule in *Ward* v. *Duke of Northumberland*, adopted in *Brinkerhoof* v. *Brown*, is stated thus : " Unconnected parties may be joined in one suit, where there is a common interest among them all, centreing in the point in issue in the cause." The same rule was approved and followed in *Fellows* v. *Fellows*, *Comstock* v. *Rayford*, 1 S. & M. 221, in *Loomis* v. *Brown*, 16 Barb. Sup. Ct., and generally in the numerous cases that have arisen in this country. In *Foss* v. *Haynes*, 31 Maine 87, the principle is stated to be that " a bill is not multifarious because it joins two good causes of complaint, growing out of the same transaction, when all the defendants" (and the same rule applies to plaintiffs) " are interested in the same claim of right, and where the relief asked for in relation to each is of the same general character;" and the same rule is laid down in Story's Equity Pl., § 284.

In *Brinkerhoof* v. *Brown*, Chancellor Kent says : " The principle to be deduced from the cases is, that a bill against several persons must relate to matters of the same nature, and having connection with each other, in which all the defendants are more or less concerned, though their rights in respect to the general subject may be distinct."

Applying these rules to this case, we think that the plaintiffs are properly joined in the suit. In what respects are their claims and complaints separate and distinct ? The substantial

facts upon which the plaintiffs rely are these : The plaintiffs and defendants signed a written agreement of partnership, which the defendants altered in a material point, and carried on a partnership business under the altered agreement : The plaintiffs did not assent to the alteration, and were not partners under the new agreement. The defendants, colluding with certain creditors of the new partnership, procured a suit at law to be brought against the firm, including the complainants as partners, and the original articles of partnership, signed by the plaintiffs, being produced on trial as the agreement under which the firm was conducted ; the plaintiffs in that suit obtained judgment for a debt of the firm against the complainants and defendants, and by procurement of the defendants had their execution levied on the separate property of the complainants, and thereby compelled them to pay each a separate sum on the judgment.

The case of the plaintiffs sets out with the fact that they were both parties to the original written agreement, and this fact is conceded ; thus far their case is joint. They allege that they were not partners, and this question of fact might depend, and has actually depended, on different proof, applicable respectively to the case of each plaintiff ; and the evidence might have been such that one of the plaintiffs would have been found to have been a partner, and the other not. This, however, is no more than happens in every case where partners sue, or are sued as such ; and, indeed, in all cases where parties are joined as plaintiffs or defendants. The proof to establish their right or their liability, may be different in the case of each, and may be sufficient as to one, and fail as to the other. If several plaintiffs sue jointly as partners, one may have become a member of the firm at one, and another at a later period, and in such case the proof that they were partners will, of course, be different as to each. But if the fact of their partnership is established, it certainly can be no objection to their joining in the suit, that different evidence applied to the case of each plaintiff. The circumstances, therefore, that on the question whether Abbot and Hunt were partners, different evidence applied to the case of each, can not make, nor tend to make, their case multifarious.

But the payments made by the plaintiffs in the execution were separate and distinct, and they could not join in a suit at law to recover them. The judgment at law in their favor would be joint for the whole amount paid, and could not award to each the separate sum paid by him to the use of the firm. The rule at law is the same, for the same reason; where several sureties on the same contract pay separate sums for their principal, they can not join in a suit at law to recover of him the several sums paid by each to his use, nor against a co-surety for contribution. But in equity, sureties may join in the same bill to recover of the principal separate sums paid for him on the same contract, and against a co-surety for contribution, and each of the plaintiffs has a separate decree for the amount paid by him. *Wright* v. *Hunt*, 5 Vesey 792; *Craythorne* v. *Swinbourne*, 14 Vesey 160; *Young* v. *Lyon*, 8 Gill 162; Burge on Suretyship 384. The fact, therefore, that the plaintiffs seek to recover separate sums of money paid by each from his individual funds, and that the relief which they ask will require that each should have a separate decree for the amount paid by him, is not of itself an objection to their joining in this bill, and we are not able to perceive that their cases are in any other respect substantially separate and distinct.

What, then, are the points of connection and union between the plaintiffs, in reference to the subject of their complaint? They were joint parties to the original agreement of partnership, out of which this controversy has grown, and which was used on the trial at law as the means and instrument of charging them wrongfully in that suit. The contrivance to have them sued as partners, and so charged for the debt of the firm, to which they did not belong when the debt was contracted, is the *gravamen* of their complaint, and this contrivance was aimed jointly and equally against them both. In pursuance of this scheme they were sued jointly in the same action at law, charged by the same joint judgment, and compelled to pay each a separate sum of money on the same joint execution. They are connected in all these points, and, being found not to have been partners with the defendants, they both stand in exactly the same relation to

the grievance which is the subject of their bill, and both require relief of precisely the same nature. Their causes of complaint grow out of the same transaction, they are interested in the same claim, to be relieved against the same joint judgment, which was procured to be rendered against them by the same contrivance and collusion. The hinging question, " the point in issue in the cause," is this contrivance to get them charged as partners, when, in fact, they were not so, and in this issue they have a common interest. Tried, therefore, by any of the general rules before stated, the case of the plaintiffs is not, we think, multifarious, and they are properly joined in this suit.