Earl, J.
Prior to 1889, the attention of the inhabitants of the city of Syracuse appears to have been strongly directed to the matter of a water supply for that city, and to that end the act, chap. 291 of the laws of that year, was passed. The act provided for the appointment of water commissioners to be known as the Syracuse Water Board. By § 3 of the act the board was authorized for and in the name of the city to acquire, construct, maintain, control and operate a system of water works to furnish the city and its inhabitants with water from Skaneateles lake. Section 18 of the act was as follows:
“ The Syracuse Water board, by and with the consent of the Canal Board, is hereby authorized and empowered to appropriate so much of the waters of Skaneateles lake AS MAY BE NECESSARY to supply the city of Syracuse and its inhabitants .with water; upon the express condition, however, that the city of Syracuse shall, when so required by the Canal Board, furnish from such source or sources, and in such manner as the Canal Board may designate, as much water for the use of the Frie canal as shall he taken hy the city from Skaneateles lake, and the power granted by this act shall be deemed to include authority and power to provide such compensating water supply for the Erie canal, and to do and perform all those acts and things which shall be needful to acquire for said city and its inhabitants the waters of Skaneateles lake.”
By the act, chapter 314, of the laws of 1890, § 18 was amended so as to read as follows:
“ The Syracuse water board is hereby authorized, under the restrictions and conditions hereinafter mentioned, to take and conduct water not required for the Erie canal, from Skaneateles lake to said city, through a pipe or main not exceeding thirty inches in diameter, for the purpose of supplying said city and its inhabitants with water. Before any water shall be so taken, however, the water board shall, at the cost and expense of said city, increase the storage capacity of said lake sufficiently to store therein all the ordinary flow of its watershed ; the fact of such necessary reconstruction having been made shall be certified by the State engineer and surveyor and superintendent of public works, and filed in the office of the superintendent of public works. All the work authorized by this section, including the placing and maintenance of said pipe, shall be executéd under the direction, supervision and control of the superintendent of public works, *651 and in accordance with the plans and specifications therefor to be prepared or approved by the state engineer and surveyor. The darn and all structures connected therewith, together with the regulation at all times of the flow of water from said lake into the aforesaid pipe, shall be and continue in the exclusive charge and control of the superintendent of public works, and shall be maintained and kept in repair by or under the direction of said superintendent, at the cost and expense of the city of Syracuse. This section shall be construed to vest in the state engineer and surveyor the power to prescribe the plan of construction and location of the gate house or other means for delivering the water of said lake into said pipe; and if for any reason the flow of water into said pipe shall prevent the state from having a sufficient quantity for all the uses of the Erie canal, the said superintendent of public works is authorized and required to stop the flow of water into said pipe in whole or in part, so far as may be necessary in his judgment to secure such sufficient quantity; it being understood that the rights of the city of Syracuse hereby conferred in and to such surplus waters are to be subject always to the superior claims of the state "thereto. Before any water shall be taken from Skaneateles lake under the provisions of this act, the city of Syracuse shall acquire or extinguish all water power rights upon the outlet of said lake to be affected by the proposed storage of water. The city of Syracuse shall, at all times, protect and save harmless the state of New York from and against all claims and demands of riparian owners upon said lake and outlet for loss or damage occasioned by any act or structure authorized hereby. The powers granted to the Syracuse water board to acquire property under this act, and to make payment therefor, shall be deemed to include full power and authority to do and perform all acts and things necessary or proper to enable said city to acquire, store and obtain water from Skaneateles lake in accordance with the provisions of this section.”
Various constitutional objections to these acts have been presented to the courts with much ability and pertinacity. A very careful re-examination of the whole case after the reargument, which the magnitude of the interests involved and other reasons peculiar to the case induced this court to grant, leaves no doubt in our minds that these objections are without foundation. We will here pass over all of them but two, leaving the others to the dispositions made of them in the opinions of Justices Churchill, Kennedy and Merwin, delivered in these cases in the supreme court, and of Judge O’Brien, in this court, after the first argument.
The two constitutional objections to which we will here giro further consideration are the alleged violation of § 6 of art. 7 of the constitution, which provides that the state shall not sell, letwe or otherwise dispose of the Erie and other canals, “ but they shall remain the property of the state and under its management forever; ” and of § 9 of art. 1, which provides that “ the assent of two-thirds of the members elected to each branch of the legislature shall be requisite to every bill appropriating the public moneys or property for local or private purposes.”
*652 (1) Section 18 of the act of 1889, as amended, does not sell or authorize a sale of the waters of Skaneateles lake to the city, nor does it lease them to it. It operates merely as a license to the city to take water from the lake and conduct it to the city under the paramount right of the state to resume it at any time. It does not authorize the city to take a drop of water needed by the state for the Erie canal. The water remains as before absolutely under the control of the state, and the provisions are ample to secure to the state all the water supply it can need' from the lake at all times. If the act is faithfully carried out, as we must assume it will be, the interests of the state are placed in no jeopardy, and the usefulness of the canal can in no way be impaired ; and yet it is claimed that this is a disposition of the Erie canal within the meaning of the constitutional provision referred to. We must construe the language used in the constitution in view of the purpose which it was intended to accomplish, and give it such force and effect as we have reason to believe the framers of the provision intended. The Erie canal was a great achievement of statesmanship, and its completion marks an era in the history of our country. It was intended to develop the interior and western parts of our state, and to open a highway for their products to tide water; and the statesmen who projected it looked forward to its still greater usefulness in carrying the products of the great west to the markets of our own country, and of the world. They embodied their enthusiasm and their hopes in the eloquent preamble to the act, chapter 262 of the Laws of 1817, “ respecting navigable communications between the great western and northern lakes and the Atlantic Ocean,” as follows:
“ Whereas, Navigable communications between Lakes Erie and Champlain and the Atlantic Ocean, by means of canals connected with the Hudson river, will promote agriculture, manufactures and commerce, mitigate the calamities of war, enhance the blessings of peace, consolidate the Union, and advance the prosperhy and elevate the character of the United States; and Whereas, It is the incumbent duty of the people of this state to avail themselves of the means which the Almighty has placed in their hands for the production of such signal, extensive and lasting benefits to the human race.”
It was deemed important in order that these beneficent results of the canals should be fully achieved that they should not fall into the hands of private individuals or corporations, but should belong to and be controlled by the state in the interest of the people, and to obviate any danger that they might be leased or disposed of to private individuals or corporations, it was deemed wise to insert in the constitution of 1821 a provision that “ the legislature shall never sell or dispose of * * * the said navigable communications or any part or section thereof, but the same shall be and remain the property of the state forever.” In the constitution of 1846 the same provision was embodied in § 6 of article 7, in language above given. Now, what was plainly meant by the language used in these sections? Manifestly that the canals as highways of commerce, connecting the lakes with *653 the Atlantic Ocean, should forever remain the property of the •state, and under its management; and it meant nothing more and could have meant nothing more. The canal waterways for the navigation of boats were not to be sold, or leased, or otherwise disposed of. under any act of the legislature. Nor could the legislature authorize the sale of any other property or thing owned by the state connected with the canals and actually essential to their operation and maintenance, and it cannot be conceived that more was intended.
It immediately became the policy of the state, notwithstanding the constitutional provision of 1821, to sell and lease the surplus waters of the canals, and that policy was inaugurated by the generation of statesmen living when the canals were projected and completed, and when the constitution of 1821 was framed. The ■early acts upon that subject, and all the acts in reference thereto, like these now under consideration, contained careful provisions that sufficient water should at all times remain for the use of the ■canals. By the Revised Statutes, 1 R. S., 230, § 75, it was provided that “ whenever in the opinion of the canal board any water may be spared from any state canal, or works connected therewith, without injury to the navigation or safety of such canal, and the persons entitled to the first privilege of taking such water shall not avail themselves thereof, or there shall be no person so entitled, the board may order a sale of such surplus water for a term of years, in their discretion, to the person who shall bid the highest annual rent thereforand at page 233, § 90, it is provided that “whenever a'sale of surplus water shall have been •directed by the canal board, the acting canal commissioner within whose line such water shall fall shall proceed to sell and convey ■such surplus water in the manner followingthen follows minute •provisions as to the mode of sale and the kind of conveyance to be given to the purchaser. One of those provisions is as follows: “The conveyance shall also contain a reservation of the right wholly to resume the water so conveyed, and the privileges thereby granted,-and to control and limit the use of such water and privileges whenever, in the opinion of the canal board or ■of the legislature, the necessary supply of water for the use of any state canal, or the safety of such canal, or works connected therewith, shall render such resumption, control or limitation necessary; and a provision that where such resumption is made, ■or control or limitation imposed, no compensation or damages .-shall be allowed for any improvements or erections made in con.seqnence of such grant or lease.”
Under those provisions there were many sales and leases of surplus waters of the canals in various parts of the state, and yet it wjas never held or claimed that such disposition of the surplus waters was a violation of the constitutional provision referred to. On the contrary, it has been repeatedly recognized by the ■courts as valid and constitutional. Ex parte Miller, 2 Hill, 418 ; Dermott v. The State 99 N. Y., 101: Varick v. Smith, 5 Paige, 137; S. C., 9 id., 547.
If the waters of Skaneateles' lake, therefore, be regarded as a. *654 pait of the Brie canal, then there is nothing in the acts of 1889 and 1890 but the disposition of surplus water not needed for the canal, and hence these acts are in harmony with the policy of the state pursued ever since the construction of the canal system of the state. If the water of the lake had all, through the outlet thereof, been taken into the canal, the surplus water thus-created in the canal could have been sold or leased therefrom by the state. Then why may it not sell of lease it from the lake before it reaches the canal? The state has always permitted the-surplus water of the lake to flow through the outlet for the use of mill owners thereon. Could it not have permitted such mill owners to take the water directly from the lake or the state dam. at the foot thereof? Heretofore the surplus water of the lake not-needed for the canal has been permitted to run to waste through the outlet under the canal on its way to Lake Ontario. Why may not the state, instead of that course for it, permit it to run through the pipe of thirty inches diameter to the city of Syracuse,, there to be used or wasted ?
By chapter 316 of the Laws of 1839 the canal commissioners•• were authorized to permit the surplus water flowing over any of the dams on the Oswego river to be used for hydraulic purposes-by the owners of the lands over or upon which such waters flowed,, under such regulations and restrictions as the canal commissioners-might impose, and subject to be resumed at any time they deemed proper without any compensation to such owners by reason of such resumption. It was never questioned that the legislature-was competent to pass that act for the disposition of the surplus-water flowing over the dam. But suppose the dam had been so constructed that the surplus water, instead of flowing over the-dam, had been permitted to flow through gates in the dam, which were under the general control of the canal officials, would not-the waters not needed for the purposes of the state have still been surplus waters ? And could not the legislature have authorized the sale and disposition of them without violating the constitutional provision referred to? The act, chapter 274 of the Laws-of 1842, provided for leasing and selling the surplus water of the Erie canal at Black Rock harbor; and these and other acts of a similar nature.
Suppose the canal commissioners had made a permanent appropriation of land for a gravel pit for the use of the canals, and the gravel had been exhausted so that they had no further use for the land, could it not be sold ? Suppose the route of the canal had been changed and the former-channel had become useless, and possibly a nuisance, and the state had no further use for it, could it not be sold, or in some way disposed of by the state ? Suppose-the state had constructed a feeder which, from misjudgment or some other cause, had become useless, would the state be bound to keep it for ever ? Could not the state allow private citizens,, under proper regulations, to use the waters flowing through any of the feeders during the winter season? And could it not, with proper regulations, permit them in the winter to use the prism or the tow-path of any canal for the purpose of travel ? It seems to me. *655 that the answers to all these questions are very plain and that it would be quite absurd to claim that in such cases there would be ¿a sale or disposition of any portion of the canals in violation of the constitution.
Numerous acts of the legislature passed since the completion of the canals show that property and rights owned by the state, and formerly appropriated and used for the canals, have been abandoned or otherwise disposed of. By chapter 286 of the Laws of 1847, the canal commissioners were authorized to drain the Jordan level of the Erie canal, and to abandon so much thereof as was no longer used or needed for the Erie canal, and authorized the owners of the land through which.the canal formerly passed to enter upon and use the same. By the act, chapter 413 of the Laws of 1847, the canal board was authorized to sell a portion of the abandoned canal at Cohoes to the owners of the adjoining land. By •the act, chapter 352 of the Laws of 1849, it was provided that whenever the canal board shall by resolution so provide, any lands taken for the purposes of the canal may be sold by the commissioners of the land office, the proceeds to be credited to the fund •appropriated for the construction of the canal for which such lands were taken.
By chap. 214 of the Laws of 1850 the canal board was authorized to abandon so much of the old canal in the village of Gfeddes .as they might deem best for the interest of the state. By chap. 263 of the Laws of the same year the canal board was authorized to abandon the Fort Miller dam and the use of the side cut at that place connected with the Champlain canal. By the act, chap. .267 of the Laws of 1857, it was provided that whenever the canal board shall, by resolution, determine that any land taken for the ■purposes of the canals of this state have been abandoned, it shall be lawful for the commissioners of the land office to sell, convey and release the title of the state thereto. By the act, chap. 787 of the Laws of 1872, the city of Binghamton was authorized to use a portion of the Chenango canal for a public street. By the act, chap. 369 of the Laws of 1877, the canal board was authorized to -close the feeder of the Erie canal in Rochester, and to convey to "the owners of the real estate adjoining the feeder the fee to the land occupied by it.
If the present contention of the appellants is well founded, and ■property once appropriated and used for the canals must forever remain the property of the state, then these various acts are unconstitutional. But if the legislature could authorize the sale of useless feeders and abandoned portions of the canals and the surplus waters of the canals, then it had the power to authorize the city of Syracuse to take the surplus waters of Skaneateles lake not needed for the use of the canals without violating the constitutional provision referred to. These various acts show the common understanding of the language used in the constitutional ■provision prohibiting the sale of the canals, and that it does not •apply to the sale of any property or rights of the state appropriated for the canals and at some time used for the canals, which -are not necessary for its operation and maintenance as a highway *656 of commerce. From the completion of the canals to this day the whole course of. legislation shows that such has been the understanding of the law makers and statesmen of our state.
The argument on the part of the appellants is not much advanced by showting that if there was power to sell the canals, and they should be sold by deed granting them with the “a] purtenanees,” and possibly without that word, the rights of the state in Skaneateles lake, together with such property as was mentioned in the various acts of the legislature above referred to, -would pass under the grant. What might be in that case deemed a portion, of the canals and appurtenant thereto would not necessarily be deemed a portion of the canals under the constitutional provision prohibiting the selling or leasing or other disposition of them. In construing the grant in such a case the court would take into consideration the intention of the parties, and from the language used -would infer that it was intended to bring within the scope of the grant everything connected and used with the canals. But in construing the constitutional provision framed for a different purpose, the same intention cannot be inferred. That must be construed as it may be supposed the statesmen who framed it understood it, while the grant would be construed so as to give effect to the intention of the parties. Hor do the ¡provisions of the Revised Statutes 1 R. S., 217, § 1, naming and describing the canals, throw any light upon this discussion. It is there provided that “ the navigable communications heretofore constructed, and now in progress of construction, by the state, shall be known and designated as follows: The navigable communication connecting the waters of Lake Erie with those of the Hudson river, and all the side cuts, feeders and other works belonging to the state connected therewith, by the name of the Erie canal.” This was a description, of the canal for administrative purposes, and it was intended to. define how much of the canal system of the state should be classified with the Ei'ie canal. That provision and the classification there found shed no light whatever on the meaning of the word canal in the constitutional provision referred to.
We are, therefore, clearly, of opinion that the acts of 1889 and 1890 cannot be condemned as in violation of § 6 of art. 7 of the constitution. It seems so plain to us that, but for the learning and ability of the eminent counsel who have appeared on behalf of the plaintiffs, we should not have considered the point worthy of very serious consideration. We have thus far proceeded upon: the assumption that the state had some property rights in the surplus waters of the lake. Of course, if it did not have, there would be no ground whatever for the present contention on the part of the plaintiffs.
(2.) It is claimed with equal zeal, and argued with much learning and ability, that the acts of 1889 and 1890 are in conflict-with the other section of the constitution above referred to. It is well to determine, in the first place, what is meant by “appropriating ” the public moneys or property for local or private purposes. It is not every appropriation for what in seme sense,, may be called a local purpose, that comes within this provision. *657 Where the appropriation of money is for state purposes, although, its expenditure is confined to a locality, it does not require a two-thirds vote. So, too, appropriations may be made, in a certain sense, for a private purpose, and yet not require such a vote. Money may be appropriated to pay individuals for property purchased for the state, or for salaries or wages, without requiring a two-thirds vote, and thus the appropriation and supply bills annually passed by the legislature, unless they contain donations of public moneys or property for local or private purposes, have never been understood to require such a vote. The word “appropriating,” as used in the constitutional provision, manifestly has no reference to the appropriation of public money or property where the state gets an equivalent. While such an appropriation may be private as to an individual, so far as it is for the' benefit of the state it is for a public purpose. While money appropriated for the improvement of Skaneateles lake, for the benefit of the persons living near it or going there for fishing or navigation, might be for a local purpose, yet if the improvement was for the benefit of the Erie canal, a highway of commerce through the state, the appropriation would not be for a local purpose, but for the general welfare of the people of the state.
It would be no more for a local purpose than the money appropriated for the construction of the capítol, of arsenals, or of any other work in a locality intended for the benefit of the people of the whole state. Except as prohibited in the section we are now considering, a majority of all the members elected to the legislature can appropriate money for any purpose and enact any laws not otherwise in conflict with any constitutional provision; and while this is so, why was this provision inserted in § 9 limiting the power of the legislature and requiring a two-thirds vote? This large vote was necessary to appropriate the money or property of the state where a locality only was interested, and from which the people of the state generally were to derive no benefit and in which they had no interest. Such bills, of no general importance, which substantially would give away the property of the state to some locality, are required to be passed by a two-thirds vote. So, too,, money or property cannot, without such a vote, be devoted to private purposes in which the state has no interest. The object and pui’pose of this provision were clearly intended to forbid the legislature, without a two-thirds votes, to make gratuitous appropriations of the public money or property to localities or individuals, and thus to divest the state of its money or property without any equivalent, and it could have no other purpose. The legislature by a majority vote could authorize a sale of the property of the state for a consideration, or the disposition of it in discharge of an obligation.
Mow, what does the section of the two acts under consideration do? Does it, in any proper sense, give away any of the property of the state? The right given to the city "of Syracuse to draw water from the lake is, as we have seen, in its very largest extent, a mere license, to be exercised under the constant supervision of *658 the state, and subject to its paramount right and control. It can never at any time, as we have before said, take water which the ■state needs, and it can use only the surplus water which would ■otherwise run to waste. It seems to us an unwarrantable use of terms to hold that such a license is an appropriation of the property of the state. But that is not all. This is not a gratuitous appropriation. The city is to increase the storage capacity of the lake, and erect and maintain at .its own expense a dam and the structures connected therewith. There are two parties to the bargain, each of which gets some advantage. The state gets a larger reservoir from which to supply the needs of the Erie canal, and has the ■dam kept in repair free of expense to it. After the so called .grant or license to the city of Syracuse the state has still the same right and control over the water for every purpose needed that it ever had; and it is impossible to perceive how, under such circumstances, it can be said that the act of 1890 appropriates money or property of the state for a local purpose, within any fair meaning of the terms used in the constitution. None of the acts •above referred to, disposing of surplus waters of the canals, were passed by a two-thirds vote. In Rumsey v. New York & N. E. R. Co., recently decided in the second division, an act of the legislature there under construction authorized the gratuitous grant of the land of the state for a local purpose, and it was held that it required a two-thirds vote. 40 St. Rep., 583.
But it is further claimed that § 18 of the act of 1889 was unconstitutional, and as it was a necessary part, of the entire scheme of that act, that therefore the whole act of 1889 was unconstitutional and void, and was not given life and rendered-valid by the •subsequent amendment of § 18.
Without determining whether § 18 as contained in the act of 1889 was valid or not, we do not think that even if it was invalid the whole act was thereby rendered null and void. A water board was thereby constituted and clothed with some powers which could be exercised, and after § 18 was amended, and thus rendered valid, nothing stood in the way of the full operation of all the provisions of the act. We are not, however, prepared to -say that if the whole act was rendered invalid in consequence of the invalidity of § 18, it would follow that the act remained invalid after the amendment. The unconstitutional provision was eliminated by the amendment, passed as we may assume, for the express purpose of validating the act As to all action taken under the act subsequently to its amendment, it would have to be construed as if the section as amended had always been a part of it. As it then stood it was an act of the legislature passed with all the forms prescribed by the constitution and containing no provision obnoxious to constitutional objection.
We do not deem it important now to discuss or determine what the particular rights of the state were in the water or the bed of the lake. These matters have been discussed in opinions already pronounced in these cases, and we reach our present conclusion without deeming it important to further investigate or determine them.
*659 In conclusion it should further be said that in dealing with the constitutional objections to § 18 proper heed must be given to the-canon of construction often reiterated by eminent judges, that when a statute is challenged as in conflict with the fundamental law a clear and substantial conflict must be found to exist to justify its condemnation. As said by Mr. Justice Washington in Ogden v. Saunders, 12 Wheat., 270, “ it is but a decent respect due to tjie wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity until its violation of the constitution is proved beyond all reasonable doubt.”
The judgment of the general term should therefore be reversed,, and that of the special term affirmed, with costs in this court.
All concur.